ESTATE OF SYDNEY S. BARON, SYLVIA S. BARON, ADMINISTRATRIX, AND SYLVIA S. BARON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14759–81.    Filed September 26, 1984.

*Thomas S. Carles*, *Richard Baron*, and *Alice M. Carles*, for the petitioners.

*Martha Sullivan*, for the respondent.

TANNENWALD, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income tax for 1977 and 1978:

| Year | Deficiency |
| --- | --- |
| 1977 | $230,031 |
| 1978 | 82,525 |

After concessions, we must determine whether petitioners are entitled to various deductions and credits claimed in connection with Sydney Baron's purchase of the U.S. and Canadian rights in the master recording of the soundtrack of the motion picture "The Deep" (sometimes hereafter referred to as purchase of the master recording).

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners' legal address at the time the petition herein was filed was in Scarsdale, NY. Sydney S. Baron (sometimes Baron), petitioner Sylvia S. Baron's husband, died in 1981, prior to the filing of the petition.

In the spring of 1977, Richard Baron, Sydney Baron's son (and a tax lawyer), called Richard Talmadge (Talmadge), an entertainment lawyer, and asked Talmadge whether he knew of any good entertainment properties in which Richard Baron's family could invest.[1] Talmadge then contacted Richard Trugman (Trugman), an old friend, who was vice chairman, secretary, and treasurer of Casablanca Record & Filmworks, Inc. (Casablanca). At first, Trugman told Talmadge that Casablanca had nothing to sell. In a subsequent conversation, Trugman told Talmadge that Casablanca would be willing to sell the U.S. and Canadian rights in the master recording of the soundtrack of "The Deep," a movie they were working on at the time.[2] Trugman briefly described the film and the record (who was involved, etc.) to Talmadge. Talmadge, in turn, relayed this information to Richard Baron. The master recording was of fine technical quality.

The original draft agreement between Baron and Casablanca, mailed by Talmadge to Richard Baron on May 12, 1977, called for a purchase price for the U.S. and Canadian rights in the master recording of $600,000, including a $500,000 nonrecourse note. The Barons insisted on the note's being nonrecourse. Because Richard Baron was not well versed in commercial transactions, he asked Martin Engels (Engels), a good friend and a commercial lawyer with whom he shared office space, to help out on the deal. Richard Baron told Engels that instead of a cash fee, his father was prepared to give Engels a $100,000 nonrecourse note (at 6-percent interest), to be paid out of 10 percent of gross proceeds which Baron would be entitled to receive in respect of his rights in the master recording.

On May 18, 1977, Casablanca sold the U.S. and Canadian rights in the master recording[3] to Whittier Development Corp., a shell corporation owned by Engels, for $550,000, payable $90,000 in cash and $460,000 by a nonrecourse note (at 7-percent-per-annum interest), payable solely out of royalties

---

[1]Richard Baron did not, at that time, know Talmadge; Richard Baron learned of Talmadge through a mutual friend.

[2]Until then, Casablanca had never sold the rights in any of its master recordings.

[3]Columbia Pictures Industries, Inc. (Columbia), formally granted Casablanca all rights to "The Deep" master recording by agreement dated June 17, 1977. However, negotiations to effect the sale began in April. Prior to May 18, 1977, Casablanca had acquired a sufficient interest in the master recording to sell the above-mentioned rights to Whittier.

from Casablanca's sale of records in respect of the master recording in the United States and Canada.[4] The note was due on May 27, 1984 (7 years later). The $90,000 cash which Whittier used to purchase the rights in the master recording was received from Sydney Baron. At all times pertinent herein, it was understood by Casablanca, Whittier, and the Barons that Sydney Baron would be the ultimate purchaser of the rights in the master recording.[5] Whittier was merely used as a middleman to provide Engels with a fee for his services.[6]

On May 27, 1977, Whittier sold all of its rights and interest in the master recording to Sydney Baron for $650,000,[7] payable $90,000 in cash (already advanced to Whittier for Casablanca), $460,000 by taking subject to Whittier's note to Casablanca, and $100,000 by Sydney Baron's nonrecourse note to Whittier. The $100,000 note was canceled by Whittier on March 1, 1978, at the request of Richard Baron, who represented to Engels that there was no further possibility of any distribution proceeds being generated. Up to that time, Engels had never attempted to collect on the note even though Sydney Baron was receiving royalties and even though Engels was entitled to 10 percent of Baron's gross royalties, i.e., without deduction for the share of the royalties which Casablanca was entitled to retain as payment on the $460,000 note.

Pursuant to a distribution agreement entered into between Casablanca and Sydney Baron, also on May 27, 1977,[8] Sydney Baron gave Casablanca the sole right to distribute "The Deep"

---

[4]The rights in many master recordings of motion picture soundtracks are sold for recording costs plus re-use fees (payments to unions). Here, the $90,000 cash payment approximated recording costs plus re-use fees. A record company's other expenses (advertising, pressing, and fabrication of albums, etc.) are recoupable from the proceeds of record sales. Here, Casablanca's other expenses (which approximated the nonrecourse note) were likewise recoupable from the proceeds of record sales as well as from one-half of the purchaser's royalty.

[5]Prior to his involvement in "The Deep," Sydney Baron had never invested in, purchased, or sold master recordings or audio tapes for production or sale.

[6]Whether a payment of Engels' fee or an increase in the purchase price, the $100,000 note would be considered an acquisition cost as against an expense item.

[7]Sydney Baron received two appraisals of the master recording, an undated appraisal from Irwin Rawitz, vice president of Dynamo Records, and one dated May 24, 1977, from George Lee, vice president of MCA records; each appraisal said there was a "real potential" that enough income would accumulate from Baron's share of the proceeds to repay the nonrecourse note and, therefore, that the fair market value of the U.S. and Canadian rights in the master recording was in excess of $650,000. Each appraisal was based on the premise that Baron would receive 80 cents for each album sold.

[8]Apparently, no distribution agreement was entered into between Casablanca and Whittier because all the parties knew that Sydney Baron was the ultimate purchaser of the master recording rights.

soundtrack[9] recordings in return for a royalty of 80 cents per LP album, including tapes, and 4 cents per 45 RPM single for records sold in the United States and a royalty of 40 cents and 2 cents, respectively, for albums and singles sold in Canada. Half of the royalties to be received by Sydney Baron were to be kept by Casablanca as partial payment of interest and principal on the $460,000 nonrecourse note.

The motion picture "The Deep" was based on a novel by Peter Benchley, the author of "Jaws." The movie "Jaws" had been extremely successful and "The Deep" was perceived as the equally successful "Jaws" sequel. The "Jaws" soundtrack album was not nearly as successful as the movie; the album did not go "gold."[10] Two independent organizations, Columbia Pictures Industries, Inc. (Columbia), and Casablanca,[11] joined forces to produce the movie. Casablanca, at that time, was considered a young, successful, and aggressive record company;[12] "The Deep" was the first motion picture production in which Casablanca participated. Making "The Deep" movie a success was of "major importance" to Casablanca.

Due to Casablanca's position in the record industry and its relationship to "The Deep" film, Casablanca wanted to produce the soundtrack album. Columbia finally decided to grant Casablanca rather than Arista Records, Columbia's subsidiary, that right. Several months before Casablanca officially received the right from Columbia to produce the soundtrack records, Casablanca was focusing on the expected album and its uses to promote the film. John Barry, the well-known arranger and composer of soundtracks for motion pictures and television specials, including "Born Free," "Midnight Cowboy," "The Lion in Winter," and several James Bond movies, had already been selected by Columbia to arrange and com-

[9]Casablanca agreed to manufacture and put into distribution a minimum of 50,000 albums and 10,000 singles no later than June 15, 1977. Casablanca also agreed to release a Donna Summer single from the soundtrack album by May 27, 1978. Casablanca released all the records it was obligated to release, including the Donna Summer 7-inch single.

[10]Prior to 1975, an album was certified "gold" through a formula based on dollars of sales. In 1975, a second requirement, 500,000 units sold, was added. In 1976, the "platinum" classification was added for albums that met a dollar formula and sold 1 million units.

[11]Columbia was the financing party (budget of approximately $5 million), but Casablanca supervised the day-to-day activities in the movie's physical production.

[12]In 1976, Casablanca had produced 20 albums, of which 9 went "gold" and 3 went "platinum." Casablanca's biggest stars in 1977 included Donna Summer and the rock group "Kiss."

pose the music for "The Deep" movie.[13] In January 1977, Neil Bogart, Casablanca's president, estimated, in a memorandum to Trugman, that, with John Barry composing the album's music, "I don't believe we will sell less than 100,000 Lps, with a potential of 300,000." Bogart also stated that "I'd feel comfortable if we can break even, and on 100,000 Lps, we'll come close * * * and help the movie." Thus, the major purpose of the album was to promote the movie.

Casablanca soon began considering the possibility of having Donna Summer, one of their "stars" (see note 12 *supra*) sing the title song in the film and on the soundtrack album. Casablanca's European licensees were very interested in such a soundtrack album, since Donna Summer had spent several years singing in Europe and was quite a sensation there. Casablanca projected that the album would sell better with Donna Summer on it. Columbia and John Barry agreed in April to have Donna Summer on the album recording. After the album was put together and the promotional activities planned, Casablanca hoped to sell, at a minimum, approximately half a million albums (i.e., go "gold").

Side 1 of the album recording contains an instrumental "ballet" by John Barry based on the score from the movie. On side 2, Donna Summer sings one song, "Theme From The Deep (Down, Deep Inside)"[14] twice, at different speeds. Side 2 also contains an instrumental version of "Theme From The Deep" by John Barry and a song "Disco Calypso" by an "obscure" group named "Beckett."

Casablanca vigorously sought to promote the movie and the album. Radio station contests with numerous prizes, including bikes, radios, cameras, Casablanca cassette libraries, and trips to Bermuda were held in over 50 cities.[15] One hundred and fifty thousand copies of the album were pressed with blue, rather than black, vinyl (at an additional cost of 25 percent, or 15 cents per album) to make the album look like the ocean. A "The Deep" poster was included with each album (at a cost of

---

[13]Notwithstanding John Barry's status as an excellent soundtrack composer and conductor (76 feature films and television shows), only one of his soundtrack albums (Midnight Cowboy) went "gold."

[14]The Donna Summer song is sung over the closing credits and for 14 seconds, at a very reduced volume, during a dance scene involving Nick Nolte and Jacqueline Bissett.

[15]If Casablanca had had to purchase the free air time it got as a result of the radio promotion, the cost would have been over half a million dollars.

approximately 10 cents per poster). Casablanca spent $250,000 to advertise the album, and thereby the movie as well, in the United States.[16] Window streamers, posters, and dump boxes (which are used for placing a large number of records in one area of a store) were placed in record stores. Having missed out on the opportunity to get "Record of the Month" status for "The Deep" album (which would have resulted in distribution of the album through K-Mart department stores nationwide),[17] Casablanca set up a deal whereby, for the first time, a contemporary album was sold nationwide through supermarkets. This promotion by Casablanca also had the effect of promoting the film whose success was of major importance to Casablanca. "The Deep" movie's net film rental for 1977 was $31 million.

"The Deep" album was, notwithstanding Casablanca's vigorous efforts, a flop.[18] Sydney Baron received royalties (before 50 percent was deducted to pay off the nonrecourse note) of $17,842 in 1977 and $10,410 in 1978. In 1979, Sydney Baron received royalties of $4,420. Thus, Sydney Baron's total royalty receipts were $32,672. On their joint returns, Sydney and Sylvia Baron elected to compute depreciation on the U.S. and Canadian rights in the master recording, pursuant to Rev. Rul. 60–358, 1960–2 C.B. 68, Rev. Rul. 64–273, 1964–2 C.B. 62, and Rev. Rul. 79–285, 1979–2 C.B. 91, using the income forecast method of depreciation. They deducted depreciation on the master recording of $401,390 (72.98 percent of $550,000)[19] in 1977 and $148,610 (27.02 percent of $550,000) in 1978.[20] Thus, the rights in the master recording were fully depreciated over

---

[16]Columbia spent approximately $4 million to promote the film.

[17]Casablanca was late in requesting "Record of the Month" status for June because many details of the album had not been settled by the critical date.

[18]The best hindsight explanation for the failure of the album to capture the ephemeral taste of the record-buying public was offered by Bruce Bird, Casablanca's vice president of promotion in 1977, who stated that the album, quite simply, "wasn't in the grooves."

The album did, however, spend 7 weeks on Billboard Magazine's "Top 100" charts. The album's best position, 70th, was reached during week 4.

[19]The Barons limited their basis in the master recording to $550,000 because the $100,000 nonrecourse note to Whittier was canceled prior to the filing of the 1977 return.

[20]The Barons' accountant did not include the 50 percent of Sydney Baron's royalty being kept by Casablanca as partial payment on the nonrecourse note when he determined the numerator and denominator of the income forecast formula. The full royalty should have been included in the calculation.

2 years.[21] The Barons also deducted recording costs of $1,500[22] and travel expenses of $500[23] in connection with the album.

## OPINION

The two principal issues which we must resolve[24] are whether: (1) The $460,000 nonrecourse note should be taken into account in determining Sydney Baron's basis for the master recording rights he acquired, and (2) in entering into the transaction for the acquisition of those rights, Sydney Baron's bona fide objective was to make a profit from the royalties aside from the tax benefits by way of large deductions.[25]

We turn our attention first to whether the $460,000 nonrecourse note from Sydney Baron should be included in the basis of his rights in the master recording. Respondent contends that the note should not be so included because: (1) The purchase price or the amount of the note unreasonably exceeds the fair market value of the rights[26] which secured the

---

[21]The Barons' accountant, Joel Rosen (sometimes Rosen), called Talmadge prior to determining the allowable depreciation. Early in 1978, Talmadge told Rosen what royalties the album had produced in 1977 and up to that point in 1978. Talmadge also stated that, since the record did not appear to be selling, he did not know if there would be any additional income at all. When Rosen spoke with Talmadge in 1979, royalty information for 1978 was given along with Talmadge's estimate of no future income. In fact, Baron earned an additional $4,419.90 in royalties, half of which was paid to Baron in 1979.

[22]There is no indication in the record what recording costs were incurred by Baron. One $750 check was made to Dynamo Records, whose vice president, Irwin Rawitz, had given an appraisal of "The Deep" album for Sydney Baron. The second $750 check payment was made to Dune Road, whose identity is unexplained. George Lee, who rendered the second appraisal, was vice president of MCA records.

[23]There is no indication in the record as to what travel expenses were incurred.

[24]Presumably because of Baron's anticipated quick recovery of cost through depreciation, no investment credit was claimed on the 1977 return. Nor was it claimed in this proceeding until petitioners' brief was filed. Because of our disposition of the principal issues in the case and because petitioners did not prove a useful life of 3 years or more for the master recording (Sydney Baron and Sylvia Baron, in fact, used a 2-year life on their joint returns), petitioners would not be entitled to any such investment credit. In any event, the claim for such credit was made too late. *Rollert Residuary Trust v. Commissioner*, 80 T.C. 619, 636 (1983), on appeal (6th Cir., Aug. 29, 1983).

[25]Master recordings were not covered by the at-risk provisions of sec. 465 until the enactment of the Revenue Act of 1978, Pub. L. 95–600, sec. 201, 92 Stat. 2814. H. Rept. 95–1445, at 68 (1978), 1978–3 C.B. (Vol. 1) 181, 242; H. Rept. 95–1800, at 219 (Conf.) (1978), 1978–3 C.B. (Vol. 1) 521, 553. The 1978 amendments to sec. 465 were made effective for taxable years commencing after Dec. 31, 1978. See Pub. L. 95–600, sec. 204, 92 Stat. 2817. Since the taxable years 1977 and 1978 are involved herein, sec. 465 is not applicable.

[26]See *Brannen v. Commissioner*, 722 F.2d 695, 701 & n. 3 (11th Cir. 1984), affg. 78 T.C. 471 (1982), particularly the concurrence of Chabot, J., 78 T.C. at 513. Like the Eleventh Circuit Court of Appeals, we find it unnecessary to resolve whether the fair market value of the rights should be

payment of the nonrecourse note, and (2) the obligation on the note is in any event too contingent. Petitioner, of course, contends that the fair market value of the rights was at least as great as, if not greater than, the purchase price (and, a fortiori, the amount of the note) and that the obligation on the note is not too contingent because there was a reasonable certainty at the time Sydney Baron acquired the rights that the note would be paid in full. We find it unnecessary to engage in an evaluation of the opinions of the experts herein as to the fair market value of Sydney Baron's rights in the master recording, because we conclude that, irrespective of the existence of some value which might be considered the fair market value, the obligation represented by the nonrecourse note was too contingent at the time Sydney Baron entered into the transaction to permit its inclusion in basis.

We start from the recognized principle that, in appropriate circumstances, obligations have been found to be too contingent to permit their inclusion in basis and that this principle has been utilized in recent cases dealing with tax shelters. See, e.g., *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), affg. in relevant part, revg. and remanding on other grounds *Brountas v. Commissioner*, 73 T.C. 491 (1979) (payment of note contingent upon discovery of recoverable amounts of oil or gas); *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979) (same); *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981) (same); *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 9 (3d Cir. 1984) (note payable solely out of book sale proceeds); *Saviano v. Commissioner*, 80 T.C. 955 (1983), on appeal (7th Cir., Oct. 7, 1983) (note payable solely out of sales proceeds of mined gold); *Graf v. Commissioner*, 80 T.C. 944 (1983) (note payable solely out of profits from foreign dredging operation). See also *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974) (obligation payable at rate of 32 percent of

---

measured against the purchase price or the amount of the note. See also *Fuchs v. Commissioner*, 83 T.C. 79, 101–102 (1984).

carload freight traffic revenue after movement of 100,000 net tons per year); *Lemery v. Commissioner*, 52 T.C. 367 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971) (obligation contingent upon business sold showing net profit); *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th cir. 1966), cert. denied 385 U.S. 827 (1966) (obligation to pay based on mileage of railroad lines); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1966) (obligation for severance pay—incurred as part of acquisition of assets of predecessor corporation—contingent upon failure to give employees notice prior to closing plant).

Applying the contingency principle, we think it clear that the $460,000 nonrecourse note was too contingent to be includable in Sydney Baron's basis. The nonrecourse note specifically provided that payments were to be made "solely out of the gross receipts" from the use of the rights in respect to the master recording. See note 32 *infra*. Thus, it seems clear that the parties contemplated that the rights had no value apart from the income stream which might be generated. More importantly, in the instant case, the income stream was totally dependent upon public acceptance of, not only the movie "The Deep," but the album and other recordings as well. While the *failure* of the movie might well hinder the album and other recordings, the *success* of the movie would not create any viable degree of assurance that the album and other recordings would be accepted by the public. Every witness at the trial herein testified that the record industry is a highly speculative business and that it is extremely difficult to predict the success of a particular record in advance of its release and the resulting indication of public acceptance. Here, at the time Sydney Baron entered into the transaction and acquired the rights subject to the $460,000 nonrecourse note, neither the movie, the album, nor any other recording had been released for sale to the public. To be sure, there were high hopes for both because of the involvement of Donna Summer (a rising star vocalist at that point), John Barry (a well-known arranger and composer), Peter Guber (a recognized movie producer who had recently produced "Jaws"), Peter Benchley (who had written the book "The Deep," his first after the record-breaking book and movie "Jaws"), and Casablanca (a well-

known record producer and distributor) and because of the extensive advance promotion efforts, most of which, however, were of the film rather than of the recordings. But these pluses are not, in our opinion, sufficient to provide a basis for a meaningful measurement of the possibility of a successful release of the music contained in the master recording.

The situation herein is to be sharply distinguished from those cases where the courts have valued movie rights and the potential income to be derived therefrom after the movie had been released. See, e.g., *Grill v. United States*, 157 Ct. Cl. 804, 303 F.2d 922 (1962); *O'Brien v. Commissioner*, 25 T.C. 376 (1955); *Herbert v. Riddell*, 103 F. Supp. 369 (S.D. Cal. 1952). In those cases, because public acceptance had been established, the courts were in a position to determine the value of the rights based upon the actual experience of the movie involved.[27] No such factual situation exists herein. As we have previously pointed out, neither the album nor other recordings nor the movie had been released for sale to the public at the time Sydney Baron acquired his rights.[28] We are satisfied that the personalties involved in the master recording of "The Deep" had not achieved such status as would permit us to view them in the same way as we might view an author whose stature practically guaranteed that his or her book, regardless of its quality, could make the Best Sellers list, or perhaps a recording artist of similar renown. Moreover, a soundtrack album on which a star makes a limited appearance, such as is involved herein, simply does not have the high degree of appeal that a record featuring such an artist could be expected to have.[29]

---

[27]Cf. *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. by unpublished order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. *Kratsa v. Commissioner, Hook v. Commissioner, Rosenblatt v. Commissioner, Leffel v. Commissioner, Zemel v. Commissioner*, 734 F.2d 9 (3d Cir. 1984); *Bizub v. Commissioner*, T.C. Memo. 1983–280, where public nonacceptance was evident.

[28]At this point, we should note that in situations, such as estate tax valuations, where the issue is the value of rights which are keyed solely to the income stream, the courts have no alternative but to determine such value irrespective of the existence of data as to actual experience. See *Dorsey v. Commissioner*, 49 T.C. 606, 632 (1968).

[29]While Donna Summer's status in the industry might have been sufficient to reasonably expect an album on which she was the sole performer to become a hit, such cannot be said for an album on which she only sang one song twice at different speeds, especially when that song was available on a single. Similarly, while John Barry was extremely well regarded within the industry, his inability to sell albums is evidenced by the fact that only one soundtrack album he composed has gone gold.

The transaction involved herein is also distinguishable from a situation where the acquisition of rental real estate or equipment is involved. In such situations, not only are the payments on a nonrecourse note usually fixed in amount, but the obligation to make the payments is not, by its terms, confined to the income produced, and the underlying property has a potential value apart from the income stream which it is expected to generate. Moreover, the value of the underlying property is not so directly and totally dependent upon public acceptance as is the case with a master recording or similar property—a factor which may also distinguish situations involving the acquisition of oil and gas or perhaps patent rights.[30] See *Gibson Products Co. v. United States, supra* at 1048–1049; *Siegel v. Commissioner,* 78 T.C. 659, 690 (1982). Cf. *Brountas v. Commissioner, supra* at 157.[31] See also *Mayerson v. Commissioner,* 47 T.C. 340 (1966).

The long and short of the matter is that, in the case before us, the value of the rights in the master recording lay solely in the anticipated income stream derived from direct and total public acceptance and that Sydney Baron was liable on the nonrecourse note only out of his receipts from that income stream. If there were no receipts, there was no obligation to pay.[32] Under these circumstances, there was no incentive for Sydney Baron to pay the note out of his other funds in order to preserve valuable property—an element which the courts have found compelling in other cases involving nonrecourse obligations. See *Brannen v. Commissioner,* 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner, supra* at 689. Under these circumstances, the amount of $460,000 represented by the nonrecourse note may not be

---

[30]We note that the acquisition of patent rights involves the right of *use* thereof, which is an element independent of the income stream to be realized from licensing. In the case of a copyright, however, i.e., a book, the value would appear to rest solely on the income stream derived from selling the copyrighted article. Conceivably, a design copyright might fall in a different category.

[31]This type of property, i.e., real estate, was involved in *Commissioner v. Tufts,* 461 U.S. 300 (1983), and *Crane v. Commissioner,* 331 U.S. 1 (1947), with the result that the rationale of those cases has no bearing on the situation involved herein. See also *Fuchs v. Commissioner,* 83 T.C. 79, 102. n. 10 (1984).

[32]While Casablanca had the right to foreclose on Baron's rights in the master recording in the event that the note was not paid at maturity, if the master recording had not generated significant income, it presumably would have had little, if any, value, and consequently Casablanca would probably not have had an economic incentive to seek foreclosure.

included in Sydney Baron's basis.[33]

It is important to note that we are dealing herein with a nonrecourse note where the obligation to make the payments thereon is, by its terms, confined to the income which the asset involved produces, where direct and total public acceptance is a key element, and where the likelihood of such acceptance has not been demonstrated. Thus, we recognize that no bright line can be drawn which will dispose of every case where a contingent nonrecourse note is involved.

We now turn to the question of whether Baron's acquisition of the U.S. and Canadian rights in the master recording and the holding thereof during 1977 and 1978 constituted, under section 183,[34] an "activity not engaged in for profit."[35] Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. *Dreicer v. Commissioner*, 78 T.C. 642, 643–645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979); *Golanty v. Commissioner*, 72 T.C. 411, 425–426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Baron's objective is a question of fact to be determined from all the facts and circumstances. *Allen v. Commissioner*, 72 T.C. 28, 34 (1979). The burden of proof is on the petitioners. *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983); Rule 142(a). In respect of petitioners' burden of proof, we observe that we have no direct evidence as to Baron's expectations either as to anticipated profit or tax benefits or the comparative importance of these two elements; for example, there was no prospectus. Presumably Baron's son Richard, who was a tax lawyer, orally explained the various facets of the transaction to his father. Consequently, our analysis is

---

[33]Nothing herein should be taken as an indication that actual payments on the note should not be included in basis. See *Siegel v. Commissioner*, 78 T.C. 659, 686–687 (1982). See also note 50 *infra*.

[34]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[35]Sec. 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Sec. 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

based upon reasonable inferences drawn from the record before us.

The regulations under section 183 list the following nine relevant factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financing status of the taxpayer; (9) the elements of personal pleasure or recreation. Sec. 1.183–2, Income Tax Regs. We see no need to dissect the record herein separately with respect to each of the foregoing factors, particularly since many of these factors are hard to fit to shelter activity of the type involved herein. Rather, we will deal with the totality of the circumstances revealed by that record in the context of the elements which the parties assert in favor of their positions.

Petitioners contend that Baron consulted with industry experts before purchasing the master recording, that there was every indication, when Baron purchased the master recording, that "The Deep" album would be a success, that Casablanca made every effort to make "The Deep" album a success, and that Baron reasonably relied on Casablanca, whose interests were similar to his own, to distribute the album in such a manner as to achieve maximum sales.

Respondent argues that tax profit, rather than economic profit, motivated Baron in his acquisition of the master recording. Numerous examples of Baron's alleged "unbusinesslike manner" in this transaction have been provided by respondent to illustrate what respondent believes was Baron's lack of concern with making a profit on his investment.

The bulk of petitioners' argument on profit motive revolves around Casablanca's promotion of the record and Baron's allegedly justifiable reliance thereon. We agree with petitioner that, from Casablanca's perspective, "The Deep" record was a legitimate business venture and that Casablanca went all out to promote "The Deep" project, although we note that Casa-

blanca's main interest was in the success of the movie, with the promotion of the records an instrument to achieving that main objective. However, that does not end our inquiry, for we still must determine *Baron's* objective.

Petitioners rely heavily on Baron's "consultation" with industry experts before purchasing his rights in the master recording. However, it is clear from the record that Baron's "consultation" was mere window dressing to conceal tax motives. It was Richard Baron who initiated the entire chain of events by calling Talmadge, an entertainment lawyer he had never met, and asking Talmadge whether any good entertainment properties were available for investment. The record contains no evidence that either Sydney or Richard Baron knew the first thing about entertainment properties. Prior to his interest in "The Deep," Baron had never invested in, purchased, or sold master recordings or audiotapes for production or sale. Similarly, although Richard Baron apparently knew so little about commercial law that he asked Engels, another lawyer, to review the purchase documents, as a tax lawyer, Richard Baron did know a great deal about the tax consequences of his parents' half-million-dollar annual income. See note 38 *infra.* On May 12, 1977, when Talmadge mailed Richard Baron the original draft agreement for the purchase, Richard Baron was aware of who was involved in "The Deep" project and had been given certain sales projections (in the half-million-unit range) by Casablanca. See note 42 *infra.* All of the details were settled by May 18, 1977, the date of the agreement between Whittier and Casablanca. Each party to the transaction knew that Engels via Whittier was merely acting on behalf of the ultimate purchaser, Baron. Of the two appraisals Baron received of his rights in the master recording, one was dated May 24, 1977 (6 days *after* the transaction was, in effect, consummated), and one was undated. See note 7 *supra.* The record contains no evidence that either of those appraisals was available, either orally or in writing, prior to May 18, 1977.[36] Thus, as far as the record herein shows, the only information that Baron had regarding his purchase prior to his entering the deal was given him by

---

[36]Indeed, there is no evidence in the record that either appraisal was received prior to May 27, 1977, the date of the contract between Baron and Whittier.

the seller via his son, Richard.[37] We think that Baron's investigative efforts leave a great deal to be desired. See *Surloff v. Commissioner*, 81 T.C. at 237; *Fox v. Commissioner*, 80 T.C. at 1015.

Respondent places great emphasis on Baron's use of nonrecourse financing, both in acquiring his master recording rights and in compensating Engels for reviewing the sales arrangement, as illustrating Baron's tax, rather than economic, profit objective. We agree. While the use of large nonrecourse financing vis-à-vis cash invested is not necessarily fatal to establishing a profit objective (see *Wildman v. Commissioner*, 78 T.C. 943 (1982)), in this case, it is a significant factor working against petitioner. See *Barnard v. Commissioner*, 731 F.2d 230, 231 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1982); *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 74 (1984).

Baron's $650,000 purchase price for the master recording rights would have produced (assuming a 70-percent tax bracket)[38] a tax benefit of $455,000 from the depreciation he expected to be able to claim (or $365,000 above his $90,000 cash investment). Cf. *Barnard v. Commissioner, supra* at 231. Even if Baron were eventually required to recapture his excess depreciation deductions under section 1245,[39] he would still be

---

[37]We find no need to speculate as to exactly how many albums Casablanca really expected to sell. At trial, Casablanca's officers and employees all testified that they believed the album would be a hit. While those witnesses were quite forthright, we find it difficult to believe that, if Casablanca really expected the album to be a hit, it would have sold certain rights in the master recording in May 1977 for $90,000 cash plus the right to receive a percentage of Baron's royalty until the note was paid off (at which time Baron would be entitled to the entire royalty) when the sale of a mere 225,001 albums in the United States would have produced more income for Casablanca if it kept rather than sold those rights. This conclusion derives from the following analysis: (a) The sale of 225,000 albums and the application of an 80-cent royalty rate produces $180,000; (b) if Casablanca had not entered into the deal with Baron, it would have been entitled to the $180,000; (c) by virtue of the deal with Baron, Casablanca received $90,000 in cash and was entitled to half of the $180,000, or an additional $90,000; (d) hence, 225,000 albums represented the break-even point.

[38]In 1977, Sydney and Sylvia Baron's taxable income (without considering the income and deductions relating to the master recording) was approximately $515,000; in 1978, their taxable income (without considering the master recording items) was approximately $345,000. During the years in issue, a 70-percent tax rate applied to all taxable income on joint returns in excess of $203,200, and a 60-percent tax rate applied to the amounts over $91,200 but not over $103,200. We have not taken into account any tax benefit from an investment credit (see note 24 *supra*), although we think it highly likely that Baron envisaged the availability of such credit at the time he acquired his rights.

[39]The Casablanca note was due on May 27, 1984. Unless Baron had already paid off the note, Casablanca could have foreclosed on it at that point. Although the Whittier note as such had no due date, the security agreement indicates that the due date was also May 27, 1984. In this connection, we recognize that, even if the right of foreclosure was not exercised, an argument could

in pocket *after* taxes and after deducting his $90,000 cash investment, over $109,000.[40] In contrast, Baron would not have even recovered his $90,000 in *before*-tax dollars until 281,250 albums were sold,[41] a figure far in excess of the number Casablanca guaranteed to distribute under the distribution agreement. See note 9 *supra*. If the album went "gold," i.e., sold 500,000 copies, which was the projection given Baron by Casablanca,[42] Baron would have received in *before*-tax dollars $70,000 above his $90,000 investment.[43] Obviously, a $70,000 profit on a $90,000 investment represents a substantial return on that investment, but we think that, while this standard may be valid for determining the potential for economic profit, it should not be determinative of the existence of the necessary profit objective in determining the applicability of section 183. If such a standard were the sole criterion, we would have the ridiculous situation that the lower the amount

be made that an abandonment might be deemed to have taken place at the time the right of foreclosure could have been exercised. We express no opinion as to the validity of any such argument. See Fass, "Motion Pictures as a Tax Shelter: A Current Analysis of the Technique and the Problems," 40 J. Tax. 154, 156 (1974).

[40]In calculating this figure, we have assumed that (1) all income and deductions relating to the master recording rights would have been subject to the 70-percent tax rate, (2) Baron would have depreciated his investment over 2 years (which he, in fact, did and which was the period petitioners' expert Brandon Phillips testified was the anticipated span over which the bulk of the recordings would be sold), (3) Baron's basis in his investment was $650,00, (4) he would have invested his tax savings in 5-percent tax-exempt bonds (U.S. Department of Commerce, Statistical Abstract of the United States - 1978, Table No. 893), and (5) any tax on recaptured depreciation would have been due in April 1985 (the Casablanca note was due in 1984). If Baron invested his $455,000 in tax savings in 5-percent tax-exempt bonds, in the 6 years between when all the tax savings would have occurred and when any tax on recaptured depreciation would have been due, Baron would have earned interest (non-compounded) of $136,500. Thus, Baron would have had $591,500 with which to pay the tax on recaptured depreciation of $392,000 (assuming no reduction in the principal amounts of the notes). This would have left Baron with $199,500, which, after subtracting his cash investment of $90,000, would have produced a "profit" of $109,500 solely from tax benefits.

[41]Baron was entitled to keep 32 of the 80 cents in royalties for each album sold in the United States until the notes were paid off; Casablanca was entitled to 40 cents per album and Whittier was entitled to 8 cents per album.

[42]John Weidenmann, respondent's valuation expert, testified that before "The Deep" album was released, he would have estimated that it would have sold between 200,000 and 300,000 copies. Brandon Phillips, petitioners' valuation expert, testified that he would have estimated that the album would have sold 600,000 copies if it was *not* a "hit" and 1 million to 1.5 million copies if it were a phenomenal "hit." Phillips also testified, however, that selling 500,000 albums, i.e., going "gold," is very difficult to do. Prior to Donna Summer's involvement in the album, Neil Bogart, Casablanca's president, estimated that the album would sell between 100,000 and 300,000 copies. After Donna Summer's involvement, Trugman estimated that the album would sell in the half-million-unit range. While we need not determine how many albums a prudent investor would have expected to sell, we would note that practically all of these estimates would generate before-tax cash to Baron far below his after-tax benefit from depreciation deductions.

[43]Neither of these cash recovery calculations considers the impact of *any* tax, including recapture of excess depreciation deductions.

of the cash investment and the higher the amount of nonre-course financing, the more likely would be the existence of a profit objective.[44] We recognize that, in some instances it has been suggested that profit should be measured in terms of the amount received over the cash investment. See *Wildman v. Commissioner*, 78 T.C. 943, 954 (1982); *Bizub v. Commissioner*, T.C. Memo. 1983–280. But neither of these cases made the existence of such a profit determinative; rather both cases, as we do herein, used this profit only as one factor to be considered in determining the taxpayer's objective.

In our view, the comparison should be made between the $70,000 and the $365,000 net benefits from the deduction for depreciation. In adopting this comparison, we are not suggest-ing that there must always be a dollar-for-dollar matching which would, in this case, necessitate a prediction of well over 2,300,000 albums,[45] a figure clearly beyond anyone's wildest imagination (see note 42 *supra*). Instead, we conclude that an intermediate position will usually be in order, namely, that the disparity between *before*-tax profit and tax benefits be weighed in the context of all the factors involved in determin-ing the existence of the requisite profit objective,[46] rather than applying a "primary or dominant" test for nontax factors (which would seem to be required by a dollar-for-dollar matching) or a "sole" objective test for the tax benefits. Cf. *Surloff v. Commissioner, supra.* See also *Lemmen v. Commis-sioner*, 77 T.C. 1326, 1339–1347 (1981), where this Court, particularly at 1340–1341, discusses the various descriptive adjectives which have been used in weighing the various factors involved. We recognize that such a standard lacks the precisional quality which would be useful in the shelter area (see Warren, "The Requirement of Economic Profit in Tax

---

[44]To illustrate the ultimate in ridiculousness, a mere $1 cash investment and a $1 profit, i.e., 100 percent of investment, would be determinative.

[45]If depreciation recapture were not taken into account, Baron's tax benefit from depreciation alone would have been $455,000 ($650,000 × 0.70). Without taking into account the time value of money, if 2,300,000 albums were sold, Baron would have been entitled to receive $1,840,000 (80 cents per album). Under our assumptions (and not taking into account interest payments and deductions therefor), he would have been able to take $650,000 in depreciation, leaving him with taxable income of $1,190,000, on which the tax would have been $833,000. He would thus have been left with $1,007,000 after taxes. Out of this, he would have had to pay $560,000 on the promissory notes. This would have left him with $447,000 less his $90,000 cash investment or $357,000 ($8,000 less than he would receive from tax benefits alone).

[46]In certain situations, the matching standard will require the conclusion that the requisite profit objective is not present. *Fox v. Commissioner*, 82 T.C. 1001 (1984).

Motivated Transactions," 59 Taxes 985 (1981)) and may appear to leave the ultimate weight to be accorded the comparison to intuitive judicial judgment.[47] See 1 B. Bittker, Federal Taxation of Income, Estates & Gifts, sec. 4.3.2 (1981). But this will not be the first time a less-than-precise standard has been applied—witness the myriad of decisions in the debt-versus-equity arena where efforts to establish a precise ratio of debt to equity have not succeeded. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 4.04 (4th ed. 1979). Moreover, our intermediate position will permit accomodation, as a mechanical comparison would not, in those areas where Congress has singled out particular transactions for favorable treatment via tax-benefit subsidies. See *Fox v. Commissioner*, 82 T.C. 1001 (1984); Warren, *supra*. Applying the foregoing analysis and the other elements revealed by the record herein, we conclude that the presence of a potential $70,000 profit on Baron's cash investment is not sufficient to cause us to conclude that Baron had a profit objective aside from the net tax benefits of $365,000 which he anticipated being able to obtain.

Respondent argues that no business person concerned with making an economic profit would impose upon himself or herself a $100,000 nonrecourse note for legal fees which would presumably have been, at most, a few thousand dollars and that Baron's $100,000 note to Whittier further exhibits his concern with tax, rather than economic, profit. Petitioners argue, however, that the $100,000 Whittier note is irrelevant, since Baron did not include it in his basis in his rights on the 1977 tax return. Whatever Baron's thinking may have been in 1978, it is clear that in 1977, when he entered this transaction, he contemplated a purchase price of $650,000 ($90,000 cash plus the Casablanca and Whittier notes) and this higher purchase price was expected to enable him to realize greater tax benefit. Consequently, in determining Baron's objective in entering the transaction, the Whittier note must be considered and, in the context of this case, respondent's argument is persuasive.

---

[47]Compare Justice Stewart's concurring opinion in *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964): "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [of hard-core pornography]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it."

Similarly, there is no evidence in the record that Baron *ever* checked with Casablanca regarding the progress of the album.[48] Respondent contends that Baron, as a prudent businessman, would have been in constant contact with Casablanca. While we agree with petitioners that Casablanca was far more qualified than Baron to direct the promotion and sale of the album and that Baron would therefore have had very little to add to the sales campaign, we still believe that Baron's *complete* absence of contact with Casablanca can only be attributed to Baron's lack of concern with an economic profit.

The long and the short of the matter is that, based on the record herein, we simply cannot find that Sydney Baron was even the least bit concerned with making an economic profit. Baron lacked the knowledge to value the rights he was purchasing and yet did not consult with any outside expert until *after* he had already committed himself to the venture. We think it more than reasonable to infer, from the record herein, that Baron was quite aware of the anticipated tax benefits to be derived from the transaction and, as a result, increased his purchase price by an additional $100,000 nonrecourse note in an attempt further to increase those benefits. The most that can be said is that Baron "was completely indifferent to the success or failure" of the sale of records from "The Deep" soundtrack. See *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1245 (1981). In sum, petitioners have not carried their burden of proving that Baron took into account the economic consequences of the transaction aside from its tax benefits, much less that such consequences were anything more than incidental to such benefits.

We hold that Sydney Baron's acquisition constituted an activity "not engaged in for profit," as defined in section 183(c). However, petitioners are entitled to deductions to the extent of the gross income derived from that activity. See *Brannen v. Commissioner*, 722 F.2d at 702–703. Since, in the deficiency notice, respondent has allowed the claimed deductions up to the amount of income received in respect of the rights in the master recording and has made no further claim

---

[48]The only contacts that Baron or his agents ever apparently had with Casablanca were when royalty checks were received and when Baron's accountant, Joel Rosen, requested sales projections so he could calculate depreciation under the income forecast method.

in respect of such deductions, we have no need to resolve the subsidiary issues of how the income forecast method should be applied under the circumstances herein and whether petitioners are entitled to miscellaneous deductions for recording and travel expenses[49] and interest.[50]

To reflect the conclusions reached herein and the resolution of undisputed issues by the parties,

*Decision will be entered under Rule 155.*

---

[49]In any event, petitioners have presented no evidence on these two deductions other than testimony by Joel Rosen, the accountant, that Sydney Baron told him he spent the money for the purposes indicated, and consequently have failed to carry their burden of proof with respect to these items.

[50]Petitioners have not claimed that Sydney and Sylvia Baron are entitled to any deductions for the portion of the actual payments as "interest" under sec. 163. Any such portion of the payments by Baron to Casablanca which might be labeled "interest" is less than the income Baron received and therefore would merely lower the amount of other deductions to be claimed against the income. See sec. 183(b). In any event, no interest deduction would appear to be allowable, since no valid indebtedness existed herein for the purposes of sec. 163. See, e.g., *Fox v. Commissioner,* 80 T.C. 972, 1018–1023 (1983). At best, the amount of any such "interest" would be included in basis for the purpose of computing depreciation, which respondent has allowed to the extent of income in his deficiency notice. See *Siegel v. Commissioner,* 78 T.C. 659, 686–687 & n. 5 (1982).