RICHARD F. GESSLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gessler v. Commissioner
Docket No. 1331-84.
United States Tax Court
T.C. Memo 1985-390; 1985 Tax Ct. Memo LEXIS 243; 50 T.C.M. (CCH) 609; T.C.M. (RIA) 85390; August 5, 1985. Oren T. Chikamoto, *245 for the petitioner. Ray K. Kamikawa, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1977
$18,990
1978
9,795
The issue is whether petitioner is entitled to certain deductions and an investment credit claimed in connection with the purchase of a master recording. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Richard F. Gessler, resided in Kaneohe, Hawaii, when he filed the petition herein. Petitioner has been employed full time as a pilot for Hawaiian Airlines since April 1966. He earned wages from Hawaiian Airlines totalling $41,442 and $49,554 for 1977 and 1978, respectively. Petitioner and his fellow pilots exchanged information concerning their various investments. Through this exchange of information, petitioner attended a sales seminar given in 1976 by the Cal-Am Sales Corporation (herein "Cal-Am") concerning certain coal investments. As a result, petitioner made such an investment. In 1977, Cal-Am contacted petitioner and invited him to attend an *246 informational seminar concerning investments in master recordings. At the seminar held in Honolulu, Hawaii, in April 1977, petitioner was furnished with various materials concerning the purchase of a master recording. The individual conducting the seminar informed petitioner that the total purchase price for a master recording was $125,000, made up of $10,000 in cash, $10,000 in the form of a recourse note payable in 12 equal monthly installments, and the remaining $105,000 in the form of a nonrecourse note. The nonrecourse note was to be paid only from the royalties from the distribution or retail sales of the master recording. Petitioner was told at the seminar that the master recording was worth more than the total purchase price of $125,000, and that Cal-Am would provide petitioner with written appraisals attesting to these values. Petitioner was told by Cal-Am that in the group of available master recordings, some would be profitable and some would noit, since the success of any individual master recording depended on audience appeal and the whim of the market. Petitioner had no education or experience in the music industry.However, he decided the master recordings offered *247 by Cal-Am were good investments because he believed that he could obtain a recording worth $125,000, for "almost a bargain price, basically $20,000.00." At a later date, petitioner was given a catalogue of titles and recording artists from which to choose his master recording. The list had hundreds of titles, broken down by style of music. Petitioner selected the master recording entitled "Lindy Bop and Boogie," performed by the Jack Millman orchestra. When he made his selection, petitioner was not familiar with the Jack Millman orchestra.On April 27, 1977, petitioner executed a master recording sale agreement (herein the "sale agreement") purporting to convey all rights to this master recording from Hendon Records Corporation, which, on or about March 9, 1977, had purchased the master recording from Music Industries, a division of Music International Enterprises, Inc., a California corporation. Music Industries was organized in 1965 by Jack Millman as a sole proprietorship. Pursuant to the sale agreement, petitioner paid $10,000 in cash, executed a recourse promissory note which called for 12 equal monthly payments of $879.20 beginning February 1, 1978, and assumed a $105,000 nonrecourse *248 note, dated June 7, 1977, which had been previously executed by Paul Hendison, as President of Hendon Records Corp., and payable to Music Industries. Petitioner made all of the cash payments pursuant to the recourse promissory note, but has made no payments with respect to the nonrecourse note because there have been no sales resulting from his master recording. The sale agreement did not conform to standard industry practice in several respects. For example, it did not list the selections that were being acquired. In addition, the sale agreement did not contain a warranty that the recording was in accordance with the contracts of the American Federation of Musicians. Finally, nonrecourse financing provided for in the sale agreement is not usual in the master recording industry. Prior to purchasing the master recording, petitioner read the prospectus furnished by Cal-Am entitled "Information Statement Relating to Purchase of Master Recording" dated April 10, 1977 (herein the "prospectus"), and two appraisal reports also supplied by Cal-Am. Petitioner did not, however, inquire as to the credentials or credibility of the two people who made these appraisals of his master recording. *249 Similarly, he did not hire an expert in this area either to evaluate his chance of making a profit or to value the master recording. Moreover, petitioner never inquired as to how much Hendon Records paid Music Industries for the master recording. The prospectus contained a great deal of information concerning the tax benefits of purchasing a master recording, including the various depreciation methods available and the tax savings resulting therefrom. It stated that Cal-Am would retain tax counsel on behalf of petitioner in the event that the Internal Revenue Service denied any of the projected tax benefits. In addition, the prospectus made it clear that there was a high degree of risk involved and that "the ultimate profitability of any recording is largely a function of its ultimate audience appeal, which can rarely be reliably ascertained in advance and over which a Purchaser has no control." After purchasing the master recording, petitioner followed Cal-Am's suggestion that it forward the master recording to the manufacturer or distributor rather than risk shipping it to petitioner in Hawaii. Thus, petitioner did not listen to either a record or cassette copy of the master *250 recording prior to signing the sale agreement or thereafter. Petitioner next sought Cal-Am's assistance in selecting a record distributor. Cal-Am suggested a number of possible distributors, but highly recommended the World Sound Distribution Company (herein "World Sound"). Petitioner contacted World Sound's offices in Los Angeles, and World Sound outlined a program calling for a $2,000 fee which would cover art work, jacket, packaging, pressing plates, pressing of phonograph records, and the initial distribution of 1,000 records. Petitioner paid the $2,000 fee in 1977 and engaged World Sound pursuant to a distribution agreement. The distribution agreement was similar to a sample agreement contained in the prospectus. It provided that petitioner would receive from World Sound, with respect to record albums, a royalty of $1.00 per unit for all net sales until such time as the royalties payable to petitioner equalled $52,500. Thereafter, he would receive $ .90 per unit up to an additional $52,500, and thereafter $ .80 per unit. With respect to pre-recorded tapes, World Sound was to pay petitioner $ .25 per unit and, with respect to single records, $ .08 per unit. Petitioner did *251 not hire an expert to review and evaluate his distribution agreement with World Sound nor did he inquire as to the cost to World Sound in pressing and distributing records made from the master recording. On June 6, 1978, World Sound sent petitioner 10 sample copies of an album pressed from a master recording which was identified by World Sound as "Lindy Bop and Boogie" by the Jack Millman orchestra. [1] Petitioner immediately listened to one of the sample albums. Upon hearing the selections for the first time, petitioner thought that some titles sounded good and others did not as far as content and style of music. Petitioner did not contact World Sound after receiving the records, but, instead, waited for notification as to the distribution and sales of the records. On June 14, 1978, petitioner received a letter from a law firm in Sherman Oaks, California, describing numerous complaints regarding World Sound's failure to honor its obligations with individuals who selected the company to market the albums and inviting *252 petitioner to participate in legal action against World Sound. Petitioner did not authorize the law firm to represent him in the legal action against World Sound. On September 18, 1978, World Sound transmitted to petitioner a document referred to as the "Record People" distribution sheet. Petitioner had assumed that Record People was a wholesaler and that the records were being distributed. However, in the fall of 1979, after not hearing from World Sound when he was scheduled to receive an accounting from them, petitioner began to make numerous phone calls to World Sound. However, no one with any authority would talk to him. During the fall of 1979, petitioner was contacted by Patricia Allen (herein "Patricia"), a former employee of Cal-Am who was then president of Krios Records, who offered to assist petitioner in remastering his albums and generating a new master tape from the sample albums pressed by World Sound. In response to this offer, petitioner forwarded two sample albums in November 1979. By letter dated December 3, 1979, petitioner asked Patricia to act as his agent, representative, and advisor in producing a duplicate master recording, and to assume a supervisory *253 and coordinating role in causing recordings therefrom to be pressed, packaged, and distributed. Thereafter, by letter to World Sound dated December 10, 1979, petitioner terminated his distribution agreement and demanded a full and complete accounting, as well as the return of his master recording. Subsequently, petitioner sent Krios Records $2,000 as an advance for the cost of remastering, pressing, and packaging the album "Lindy Bop and Boogie." Simultaneously, petitioner spoke to Patricia who informed him that both she and Jack Millman listened to the record pressed by World Sound and discovered that most, if not all, of the cuts of that record were not the works or songs that Jack Millman recorded. With petitioner's approval, Millman made a duplicate of the original master recording from his original tapes of the live recording in San Diego during 1961 or 1962. [2] However, before the records were pressed and distributed from the new master recording, petitioner was unable to contact Patricia despite numerous attempts to do so. Thereafter, petitioner no longer dealt with Patricia Allen. [3]
*254 Petitioner's master recording has never generated any sales, income, or profit. On his 1977 return, petitioner claimed a depreciation deduction of $27,776, [4] an investment credit of $4,519, and a $2,000 deduction for distribution costs in connection with the purchase of the master recording. On his 1978 return, petitioner claimed a depreciation deduction of $24,306, and deducted $44 in legal and professional fees with respect to his purchase. In his notice of deficiency, respondent disallowed the entire amount of these deductions and the investment credit claimed in connection with the master recording. OPINION The sole issue is whether petitioner is entitled to the deductions and investment credit claimed as a result of his purchase of the master recording "Lindy Bop and Boogie." Respondent disallowed these deductions and the credit on a variety of grounds. Respondent's first contention is that petitioner did not purchase the master recording with the bona fide objective to make a profit from the royalties, but rather he purchased it solely *255 for the tax benefits. [5]
Section 183(a) [6] provides that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided therein. Section 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable *256 by reason of paragraph (1)." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." [7]
*257 Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 643-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Profit objective is a question of fact to be determined from all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof is upon the taxpayer, ( Surloff v. Commissioner,81 T.C. 210, 233 (1983); Rule 142(a)), with greater weight placed upon objective facts than upon mere statements of intent.Sec. 1.183-2(a), Income Tax Regs.; Churchman v. Commissioner,68 T.C. 696, 701 (1977). In carrying this burden the taxpayer need not demonstrate that his expectation of profits was reasonable, but only that he held an actual, and honest profit objective. Allen v. Commissioner,72 T.C. 28, 33 (1979). *258 The regulations under section 183 identify 9 factors, derived from prior case law, which are to be considered in determining whether the requisite profit motive is present. The factors are: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. In deciding whether the requisite profit motive exists in any case, however, the presence of one, or even a majority, of these factors is not determinative. Benz v. Commissioner,63 T.C. 375 (1974); Golanty v. Commissioner,supra.Since many of these factors are difficult to apply to this type of activity, we will deal *259 with the totality of the circumstances as revealed by the record herein. See Estate of Baron v. Commissioner,83 T.C. 542, 554 (1984). Petitioner contends that he purchased the master recording with every indication that it would be a success, that Cal-Am represented to petitioner that the master recording was worth at least $125,000, and that he treated this purchase as business endeavor. Respondent argues, however, that tax profit, rather than economic profit, motivated petitioner's acquisition and holding of the master recording. Numerous examples of petitioner's "unbusinesslike manner" in this transaction have been cited by respondent to illustrate what respondent believes was petitioner's lack of concern with making a profit on his investment. For the following reasons, we agree with respondent that petitioner's decision to acquire the master recording was not based upon the types of considerations that normally would be expected to influence a sincere investor who seeks an economic profit. [8]
*260 First, we note that petitioner had absolutely no education or experience in the music industry at the time he purchased the master recording. Despite his lack of knowledge, petitioner did not make an independent study to appraise what he was purchasing nor did he consult any experts to evaluate his change of making a profit and to value the master recording. Petitioner relied solely on Cal-Am's representations that the master recording was worth $125,000 without investigating the character or reliability of Cal-Am or the individuals controlling it. Although Cal-Am included in its prospectus two appraisal reports which stated that the master recording was worth at least $125,000, petitioner failed to inquire as to the qualifications and credibility of the persons who made these appraisals. Furthermore, petitioner was fully aware of the admonitions and caveats in the prospectus. For example, the prospectus warned that only a small percentage of all master recordings generate a profit to their respective owners. The prospectus emphasized the tax benefits involved, including the various methods of depreciation available. Thus, there is very little in the prospectus to inspire a *261 belief that sales would ever be substantial. Taken as a whole, the prospectus accentuated the beneficial tax consequences and the concurrent risks while affording little hope for a potential economic return from the master recording. In addition, petitioner, who had no prior experience in marketing musical recordings, and had never heard of the Jack Millman orchestra, did not even listen to the master recording before he purchased it. Failure to make such elementary inquiries and to obtain expert advice in such a transaction is inconsistent with ordinary sound business practice and is evidence that petitioner lacked a profit motive. Flowers v. Commissioner,80 T.C. 914, 938 (1983); Surloff v. Commissioner,81 T.C. 210, 237 (1983). Moreover, the sale agreement did not conform to standard industry practice, further evidencing that petitioner's dealings were not undertaken in a businesslike manner. The agreement failed to list the selections that were being acquired, and it did not contain a warranty that the recording was in accordance with the contracts of the American Federation of Musicians. In addition, nonrecourse financing is not standard *262 in the industry. Finally, based solely on Cal-Am's suggestion, petitioner entered into a distribution agreement with World Sound. Petitioner failed, however, to get any advice prior to entering into such an agreement to determine whether the provisions therein were in accordance with standard industry practice at that time. In fact, Cal-Am apparently had a prior arrangement with World Sound because the sample distribution agreement attached to the prospectus was almost identical with the distribution agreement petitioner signed with World Sound. After signing the distribution agreement on or about November 1, 1977, petitioner did not hear from World Sound until June 6, 1978, when he received the 10 sample albums. Although petitioner was dissatisfied with the quality of the record, he did not then contact World Sound, but, instead, waited for notification as to the distribution and sales of the records. Despite his dissatisfaction and his awareness of a pending lawsuit against World Sound, petitioner took no action, but he simply waited until the fall of 1979 to contact World Sound to find out if it was complying with the distribution agreement. Although no one with authority *263 at World Sound answered his calls, petitioner waited until he received a call from a former employee of Cal-Am in the fall of 1979 to take any further action with respect to his master recording. [9]
Thus, petitioner has failed to show that he entered into the purchase of the master recording with any genuine business purpose or concerns other than that of obtaining large deductions and credits. It is almost inconceivable that petitioner would have entered into this purchase in this manner--without hearing the master recording, without hiring experts to evaluate the recording, without knowledge of the recording industry in general and particularly the reliability of Cal-Am and World Sound, and without concrete plans for producing and marketing the master recording, if he was motivated by economic profits. *264 Taking into account the emphasis on tax benefits in Cal-Am's prospectus, the only plausible explanation for petitioner's participation in the venture was the prospect of obtaining tax benefits. Accordingly, we hold that the transaction was entered into and carried out with a complete indifference to profit. Since petitioner received no income from the activity, he is not entitled to any deductions or credit under section 183 for 1977 and 1978. [10]
To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. The title of the album cover of these samples is denoted as "Lindy Bop and Boogie" while the record label itself denotes the title as "Linda Bop and Boodie."↩
2. At the trial of this case, the Court listened to both the album produced by World Sound and the one subsequently produced by Jack Millman. ↩
3. Jack Millman suggested to petitioner that, rather than carrying on any further dealings with Patricia Allen, he should deal with someone more established in the record industry. Millman highly recommended the International Record Distributors Association (IRDA) in Nashville, Tenn. Petitioner therefore contacted represenatives of IRDA for information concerning manufacturing, distribution, and promotion. Subsequently, petitioner signed an employment contract with IRDA by letter dated June 2, 1980 and sent IRDA $2,750. By letter dated July 15, 1980, IRDA provided petitioner with a status report on the production of the record label. In July 1980 1,000 records were produced, and, in September 1980, IRDA sent petitioner 25 record albums.↩
4. Petitioner used the sum of the years-digits method of depreciation using a useful life of eight years and a basis of $125,000.↩
5. We note that master recordings were not covered by the atrisk provisions of sec. 465 until the enactment of the Revenue Act of 1978, Pub. L. 95-600, sec. 201, 92 Stat. 2814. H. Rept No. 95-1445 at p. 68, 1978-3 C.B. (Vol. 1) 181, 242; H. Rept. No. 95-1800 (Conf. Rept.) at p. 219, 1978-3 C.B. (Vol. 1) 521, 553. The 1978 amendments to sec. 465 were made effective for taxable years commencing after December 31, 1978. See Pub. L. 95-600, sec. 204, 92 Stat. 2817. Since the taxable years 1977 and 1978 are involved herein, sec. 465 is not applicable.↩
6. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
7. Secs. 162 and 212(1) and (2) permit full deduction of all ordinary and necessary expenses paid or incurred in carrying on a trade or business or in the production of income. However, an activity does not rise to the level of the carrying on of a trade or business under sec. 162(a) nor are expenses incurred for the production of income under sec. 212(1) or (2) unless the activity is engaged in with the objective of realizing a profit. Brannen v. Commissioner,78 T.C. 471, 499 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Where not engaged in for profit, sec. 183 provides that deduction of expenses is essentially limited by the amount of income generated by the activity. To fully deduct expenses under secs. 162 or 212, therefore, an individual must be prepared to demonstrate an associated profit motive. A similar analysis is applicable with respect to the investment tax credit. Flowers v. Commissioner,80 T.C. 914, 931 (1983). The credit is only available on property that is depreciable and has a useful life of at least three years. Sec. 48(a)(1). Thus, if property cannot be depreciated because it was not used in a trade or business, or was not held for the production of income, it cannot qualify for the investment tax credit. Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164↩ (9th Cir. 1984).
8. Although petitioner appears to be one of the many victims of Cal-Am and World Sound's aggressive marketing of tax shelters, petitioner nevertheless made no inquiry concerning these entities prior to acquiring the master recording as any prudent investor would.↩
9. We note that greater weight has been given to the facts concerning petitioner's actions prior to purchasing the master recording and during the years in issue. Although he took some action with respect to the master recording after the fall of 1979, we have our doubts that petitioner's motivation was anything but respondent's pending audit which began in September 1978.↩
10. Based on our holding, we need not address respondent's alternative arguments. We also note that the parties in their briefs addressed an evidentiary question as to which master recording, the one pressed by World Sound or the one reconstructed by Jack Millman, is the one petitioner thought he was buying. We need not address that question, however, because our conclusion as to petitioner's profit motive is the same with respect to either master recording.↩