JOHN M. SEELY and BARBARA J. SEELY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seely v. Commissioner
Docket No. 22230-83.
United States Tax Court
T.C. Memo 1986-216; 1986 Tax Ct. Memo LEXIS 390; 51 T.C.M. (CCH) 1087; T.C.M. (RIA) 86216; May 29, 1986. Debra L. Bowen, for the petitioners. Paul H. Weisman, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1976
$778
1977
12,871
1978
8,900
1979
11,729
*392 The issues for decision are (1) whether petitioners' corporation executed a valid subchapter S election for the years in issue; (2) whether petitioners are entitled to an investment tax credit and depreciation and other expense deductions regarding their master recording activity; and (3) whether petitioners are liable for additional interest under section 6621(d). [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner John M. Seely (petitioner or John M. Seely) and Barbara J. Seely resided in Manhattan Beach, California, at the time their petition was filed. They filed joint Federal income tax returns for each of the years in issue. Petitioner was employed by the Los Angeles City College as a physical education and health instructor, and petitioner's wife ws employed by an elementary school to teach a variety of subjects. They reported on their tax returns combined wages of $45,898, $53,276, $52,097, and $58,189 *393 for years 1976, 1977, 1978, and 1979, respectively. In 1976, petitioners and two other individuals, Clarke and Pritko, purchased Harbor Village Inn, a restaurant and cocktail lounge. They initially operated the business as a general partnership, and petitioners' interest in the partnership was held in the name John M. Seely. The form of ownership was changed to a corporation entitled Clarke, Pritko, and Seely, Inc. (the corporation) in or about November 1976. A Form 2553 (Election by Small Business Corporation) was executed on December 4, 1976, by petitioner, who was Treasurer of the corporation, and subsequently submitted to the Internal Revenue Service Center in Fresno, California. That form provided that the corporation was incorporated on November 1, 1976, and commenced business on November 14, 1976. It identified the following shareholders and their respective shares: Clarke, 1,350 shares; Pritko, 1,350 shares; and John M. Seely, 2,700 shares. The form further provided as follows: "For this election to be valid, the consent of each stockholder must accompany this form or be shown below. See instruction D." Instruction D, on the reverse side of the form, included *394 the following requirement: "[t]he consent must be signed by both husband and wife if they have a community interest in the stock or the income from it, and by each tenant in common, each joint tenant, and each tenant by the entirety." Under the heading "Shareholders' statement of consent," John M. Seely signed and dated the form on December 5, 1976, and Clarke and Pritko signed and dated the form on December 8, 1976. Barbara J. Seely did not sign the form. The shares in John M. Seely's name were held as community property by petitioners. In or about 1977, petitioner met by happenstance Paul Hendison (Hendison), a sales representative for Jackie Resources, Inc., a corporation which offered master recordings for sale. Hendison explained to petitioner about his business and about master recordings. Petitioner then listened to a number of recordings and particularly liked one by Johnny Dark entitled "Avocado Summer." Approximately one week later, petitioner returned to Jackie Resources with his wife. She listened to "Avocado Summer" and also liked it. Petitioners, who had no prior experience with master recordings, were provided a document dated October 17, 1977, and entitled *395 "Jackie Resources, Inc. Presents Information Memorandum Relating to Purchase of a Master Recording" (memorandum). The memorandum contained information regarding the following: product - a master recording, purchase price, distribution, and tax considerations. The memorandum stated that the records to be sold commercially might be distributed by the purchaser or a distributor selected by the purchaser. A list of prospective distributors, including International Record Distributing Associates, was attached to the memorandum. The memorandum noted that if a distributor is used, a portion of the initial distribution expenses may be borne by the purchaser. The memorandum stated that the profit potential for any record was "extremely speculative" and that a record rarely generated enough receipts to pay the full purchase price or produce any profits. The memorandum emphasized tax considerations such as depreciation and investment tax credit. For example, based on a hypothetical purchase price of $137,500 ($12,500 cash at closing, a $12,500 promissory note due the subsequent year at 8 percent interest and secured by a letter of credit, and a $112,500 nonrecourse promissory note due *396 in 8 years at 6 percent interest), an income forecast method of depreciation (7 years useful life), and an assumed individual income tax bracket of 50 percent, the memorandum set forth the following information in a table identified as "Master Record Purchase Tax Write-Off Illustration": Cash Outlay
Down-
Distribution
Depreciation
Year
payment
Cost
Total
Percentage
1
$12,500
$2,700
$15,200
40%
2
12,500
12,500
50%
3-7
10%
TOTAL
$25,000
$2,700
$27,700
100%
Deductions
Distribution
Year
Depreciation
Cost
Total
1
$ 55,000
$2,700
$ 57,700
2
68,750
68,750
3-7
13,750
13,750
TOTAL
$137,500
$2,700
$140,200
Tax
Equivalent Write-Off
Tax Savings
Investment
Year
On Deductions
Tax Credit
Total
Dollars
Multiple
1
$28,850
$9,167
$38,017
$ 76,034
5.0
2
34,375
34,375
68,750
5.5
3-7
6,875
6,875
13,750
TOTAL
$70,100
$9,167
$79,267
$158,534
5.7
More than 45 percent of the text of the memorandum was devoted to "tax risks" and "income tax factors." It repeatedly recognized the potential *397 for challenge by the Internal Revenue Service, particularly with regard to basis, at-risk rules, and section 183. The memorandum stated that the seller would provide the purchaser with two "appraisals" of the master recording and recommended that the purchaser obtain an independent appraisal. Petitioners were given two letters addressed to Jackie Resources, Inc. and dated March 1977. One letter, from Ernie Freeman of Hollywood, California, stated that "Avocado Summer" was "well produced and conceived in recording," that it should realize sales of up to 250,000 units, and that $110,000 seemed to be a fair price for the master recording. The other letter, from Douglas L. A. Foxworthy of La Jolla, California, stated that "Avocado Summer" was an "excellent instrumental country vocal easy listening master" and that sales should exceed 350,000 units. Petitioners did not seek any other appraisal; however, Hendison estimated to petitioners that they would sell 100,000 copies during the first year. On December 20, 1977, petitioners executed an agreement to purchase the master recording for "Avocado Summer." The purchase price was $110,000, comprised of a $20,000 cash downpayment and a *398 nonrecourse promissory note for $90,000 due May 31, 1985, and payable solely out of proceeds from record sales. A security agreement and an assignment of sales proceeds on the $90,000 note were also executed by the parties. Under the assignment of sales proceeds, petitioner agreed to pay to Jackie Resources $ .75 for each album sold ($ .25 if the selling price of album was under $3.95) and $ .10 for each single record sold until the note was paid in full. Petitioners paid the cash protion of the purchase price by two cashiers checks dated December 22 and 29, 1977. At some time in 1977 or 1978, petitioners received literature on International Record Distributing Associates (IRDA), an association of small independent record companies headquartered in Nashville, Tennessee. Subsequent to a conversation with the president of IRDA, petitioners received the following letter: November 20, 1978 Dear Mr. Seely: As per our conversation today, please find enclosed two executed copies of our Employment Contract. Please sign both, retaining one for your files and return the other to me with your check for $2,250.00. We shall obtain the master tape and label copy from Jackie Resources *399 and your album "AVOCADO SUMMER" by Johnny Dark will go into production as soon as we receive all the materials. Also, please find enclosed our company's press kit which will give you more information about IRDA. We are very happy to be working with you on this project and if there is anything else you require, olease let me know. Very truly yours, /s/ Hank Levine Hank Levine, President, IRDA/ALBUM WORLD The employment contract referenced in the letter quoted above was dated November 20, 1977, and provided for the distribution of "Avocado Summer" by IRDA. In the employment contract, petitioner represented that he owned all rights, title, and interest in and to the master recording of "Avocado Summer" by Johnny Dark. Petitioner agreed to pay IRDA $2,250 to produce 1,000 records and to exploit, advertise, and promote the records. For each album sold and not returned, IRDA agreed to pay petitioner $1.69, and for each single record sold and not returned, IRDA agreed to pay petitioner $ .20. The contract required IRDA to submit to petitioner periodic statements every 180 days and granted petitioner the right to terminate the contract by giving IRDA 10 days' written notice. *400 Petitioners made several phone calls to IRDA regarding the progress of production and distribution of "Avocado Summer." In response, petitioner received a letter from IRDA on March 19, 1979, stating that it would soon be ready to go into full distribution of "Avocado Summer" and that the albums might reach the market place in 4 to 6 weeks.On April 11, 1979, petitioner received another letter from IRDA. That letter stated that the primary cause for delay in distribution was approval of the album cover and test pressing and that the album would be a big commercial success because of Johnny Dark's recent television exposure on "Make Me Laugh." Petitioners received copies of the album "Avocado Summer." They played the album in their lounge and also handed out promotional copies. Petitioners telephoned several radio stations to verify that the stations had received "Avocado Summer" and that the album was being promoted by IRDA. Although stations contacted had received the album, petitioners learned that IRDA had conducted no promotional campaigns. Petitioners did not receive the periodic statements promised by IRDA except for two royalty statements, one of which was marked "final *401 statement." These statements reflect three transaction dates: December 30, 1980; June 30, 1981; and December 30, 1981. On these dates, the statements report some or all of the following: zero consignments sales in units, zero net units sold or unreturned, zero units paid or previously reported and paid, and zero dollars due. Petitioners maintained no business records or bank accounts regarding the master recording. Subsequent to petitioners' taxable years in issue, Johnny Dark's success as a performer grew. He performed in Law Vegas, Nevada, at the Hacienda Resort Hotel and Casino in 1981 and at the MGM Grand Hotel in 1984. On their Federal income tax returns for each of the years in issue, petitioners deducted 50 percent of the corporation's losses. On their 1976 tax return, petitioners computed their share of the corporation's investment tax credit; however, the credit did not reduce their tax liability because they reported no tax due. On their 1977 tax return, petitioners deducted from their tax liability an investment tax credit for their purchase of the master recording. On their 1977, 1978, and 1979 tax returns, petitioners deducted losses arising from their master *402 recording activity; these losses were composed of depreciation expenses, a distribution fee, and other nominal expenses. In his notice of deficiency, respondent disallowed petitioners' share of the corporation's loss deductions and petitioners' share of the corporation's investment tax credit on the ground that petitioners' corporation did not execute a valid election for subchapter S status. Respondent disallowed the losses arising from petitioners' master recording activity on the grounds that the purchase of the master recording was a sham and that the activities associated with the master recording did not constitute trade or business activities under section 162 or income producing activities under section 212. Respondent also disallowed the 1977 investment tax credit on the ground that the master recording did not qualify for the investment tax credit. Before the trial of this case, respondent amended his answer to assert that petitioners are liable for additional interest under section 6621(d). OPINION Subchapter S Issue
Section 1372(a) provides that any small business *403 corporation may elect not to be subject to taxation under chapter 1 of the Internal Revenue Code and that "such election shall be valid if all persons who are shareholders in such corporation * * * consent to such election." Section 1372(c) provides that the election shall be made in such manner as the Secretary shall prescribe by regulations. Section 1.1372-3(a), Income Tax Regs., provides in pertinent part as follows: The consent of a shareholder to an election by a small business corporation shall be in the form of a statement signed by the shareholder in which such shareholder consents to the election of the corporation. * * * Each person who is a shareholder of the electing corporation must consent to the election; thus, where stock of the corporation is owned by a husband and wife as community property (or the income from which is community property), or is owned by tenants in common, joint tenants, or tenants by the entirety, each person having a community interest in such stock and each tenant in common, joint tenant, and tenant by the entirety must consent to the election. * * * Respondent determined that petitioners' corporation's subchapter *404 S election was invalid because petitioner's wife, Barbara J. Seely, did not sign the election form. Petitioners argue that although they held the corporate stock as community property, petitioner John M. Seely's signature is sufficient for a valid election because the signature of both spouses is not required by California community property law regarding personal property. We disagree. Federal tax statutes are not to be limited by State laws that identify and describe the relationship between individuals and other potential taxpayers. Commissioner v. Tower,327 U.S. 280, 288 (1946); Burnet v. Harmel,287 U.S. 103, 110 (1932). Petitioners also argue that respondent is estopped from denying the election because the language on respondent's Form 2553 did not, during the years in issue, require the consent of both spouses holding the stock as community property. In support of this argument, petitioners cite Allied Steel Construction Co. v. Employers Casualty Co.,422 F.2d 1369, 1371 (10th Cir. 1970), for the proposition that "estoppel *405 arises where one party makes by its words or actions a false representation of fact, and the other party reasonably relies on the misrepresentation and is prejudiced thereby." Petitioners contend that estoppel applies because the 1976 Form 2553 failed to require on its face the consent of petitioner's wife and because subsequent Forms 2553 promulgated by the Internal Revenue Service have included this requirement on the face of the document. Although the face of the 1976 form did not set out the consent requirement, the instructions on the back of the form did. Petitioners argue that because the form was subsequently revised, respondent has admitted that the 1976 form was misleading. This argument lacks merit. The fact that the form could be improved does not mean that it was misleading or that the instructions, or the applicable law, could be ignored. Neither respondent nor any agent of respondent made any misrepresentation regarding the consent requirement for a valid subchapter S election. These circumstances do not give rise to an estoppel. Cases applyig section 1372 to stock held *406 as community property have consistently denied subchapter S status to corporations where the election form failed to include the spouse's consent, Clemens v. Commissioner,453 F.2d 869 (9th Cir. 1971), affg. a Memorandum Opinion of this Court, and where the spouse's written consent ws untimely, Forrester v. Commissioner,49 T.C. 499 (1968). Petitioners argue that Forrester, on which the court in Clemens exclusively relied, can be distinguished factually. Petitioners contend that in Forrester, the wife (of a record shareholder) filed a separate untimely consent and that therefore the husband was not purporting to act for the community. Here, petitioner's wife, according to testimony, orally consented to whatever action petitioner might take; therefore, petitioner argues that he was acting for the community. Petitioners' reliance, however, on the "acting for the community" dictum of Forrester ignores our application therein of a hard and fast rule which requires a spouse's filed consent and which has been consistently and strictly applied since about 1960. As we stated in Forrester in our analysis of the relevant statutes, *407 regulations, and particularly the legislative history, Congress consented to and approved the Commissioner's requirement that both spouses must make the election in community property states. See Forrester v. Commissioner,49 T.C. at 506-507. Cf. Wilson v. Commissioner,560 F.2d 687 (5th Cir. 1977) (where an election was upheld without a record shareholder's wife's consent; because the record shareholder held only a nominal interest in the corporation, he did not have a "beneficial ownership" and therefore did not meet the definition of a shareholder for purposes of the consent requirement). Although we are not unsympathetic to petitioners' position on this issue, they have not brought themselves within any exception to the controlling authorities. Petitioners' deductions of the corporate losses and the corporate investment tax credit were therefore properly disallowed by respondent. Master Recording
Petitioners argue that the purchase of the master recording was a valid business transaction entered into with a bona fide objective of making a profit and that therefore they are entitled to depreciation and other expense deductions and *408 an investment tax credit based on their $20,000 cash investment in the master recording. Because petitioners are now asserting entitlement only with regard to the $20,000 cash paid, we recognize this as a concession that they are not entitled to any deductions of an investment tax credit with respect to the the $90,000 nonrecourse note. Respondent argues that the master recording activity was not engaged in for profit and that the purchase of the master recording was a sham transaction. Respondent further argues that the property does not qualify for investment tax credit. If we find that the purchase of the master recording was not a sham transaction but that the activity was engaged in for profit, respondent argues that petitioners' basis in the master recording cannot include any excess of the purchase price over the fair market value of the master recording. According to respondent (and the only evidence of fair market value), that is $10,000. To qualify for the claimed depreciation and other expense deductions with respect to the master recording, petitioners must demonstrate that the master recording was used in a trade or business or was held for the production of income. *409 Sections 162, 167, and 212. Under section 48(a)(1), the investment tax credit is allowable only for property for which depreciation (or amortization in lieu thereof) is allowable. Thus, petitioners' right to the deductions and investment credit depends on their showing that the activity in question constituted a trade or business or was undertaken and carried on for the production of income. See Beck v. Commissioner,85 T.C. 557, 569 (1985). Essential to such a showing is a demonstration that petitioners had "an actual and honest objective of making a profit." Beck v. Commissioner,supra;Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), on appeal (2d Cir., Mar. 26, 1985); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A reasonable expectation of making a profit is not required; however, petitioners' objective of making a profit must be bona *410 fide. Beck v. Commissioner,supra;Estate of Baron v. Commissioner,supra;Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). Courts often use words such as "basic," "dominant," "primary," "predominant," and "substantial" to describe the requisite profit objective. Beck v. Commissioner,85 T.C. at 570, and cases cited therein. In this context, "profit" means economic profit, independent of tax savings. *411 Beck v. Commissioner,supra, and cases cited therein. If the activity is not engaged in for profit, the deduction of petitioners' expenses relating to the activity is allowed only to the extent of gross income generated by the activity. Section 183(a) and (b). Whether petitioners possessed the requisite profit motive is a question of fact to be determined on the basis of all the facts and circumstances.[2]Beck v. Commissioner,85 T.C. at 570; Estate of Baron v. Commissioner,supra.No one factor is determinative; however, greater weight will be given to objective facts than to petitioners' statements of intent. Beck v. Commissioner,supra;section 1.183-2, Income Tax Regs. The burden of proof is on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Surloff v. Commissioner,81 T.C. 210, 233 (1983); Rule 142(a), Tax Court Rules of Practice and *412 Procedure.
Based on our consideration of all the facts and circumstances, we conclude that petitioners did not engage in their master recording activity with an actual and honest objective *413 of making a profit. Therefore, because no income was generated by the activity, petitioners are not entitled to any deductions or an investment tax credit regarding the master recording activity. Petitioners testified that they purchased the master recording hoping to make a lot of money so they could buy their "dream house." Even assuming we accept this testimony, it does not mean that petitioners had an "actual and honest objective of making a profit" when they purchased the master recording. Increased spendable income resulting from increased deductions may have satisfied the objective they described. [3]
Petitioners' conduct prior to their purchase of the master recording of "Avocado Summer" did not indicate a profit objective. Petitioners argue that their decision to purchase the master recording was based on the following: (1) petitioners met a record promoter; (2) petitioners listened to a recording of "Avocado Summer" and liked it; (3) petitioners read two "appraisal" letters provided by the seller which favorably described the profit potential of "Avocado Summer"; and *414 (4) petitioner allegedly calculated a profit of $50,000 to $60,000 on the sale of 100,000 albums. Petitioners, however, did not have any experience in the distribution of master recordings. They did not consult any independent experts regarding the distribution of master recordings or specifically regarding the profit potential of the master recording of "Avocado Summer." Petitioners' information memorandum on the purchase of master recordings repeatedly warned that profit potential was extremely speculative and that a record rarely generated enough receipts to pay for the purchase price. Furthermore, if petitioners had seriously considered the nontax merits of the investment, it is improbable that they would have blindly relied on appraisals furnished by the seller, particularly in view of the cautionary language in the information memorandum. See Beck v. Commissioner,85 T.C. at 572. Petitioner testified as follows regarding his alleged profit calculation: My profit margin was roughly a $1.70 per album and at that rate, 100,000 albums would have been about $170,000. I would have owed $110,000, so I figured about a $50,000 or $60,000 profit. * * * Petitioner *415 provided no details or documents to explain or support his alleged computation. It is incomplete and unrealistic. Petitioner ignored the interest to be paid on the $90,000 debt obligation and failed to take into account the costs of production and distribution. Those costs were $2,250 for the first 1,000 albums, or $2.25 per album, which is 56 cents more than the $1.69 per album actually sold that petitioner would have earned under the agreement with IRDA had any of the 1,000 albums been sold. Because petitioner made no arrangements for production of additional albums, we do not know what those costs would have been. But apparently neither did petitioner. Petitioner testified that he knew nothing about the potential tax consequences resulting from the purchase of a master recording. This testimony is difficult to believe, especially in view of the information memorandum.More than 45 percent of the text of that memorandum was devoted to the tax ramifications of purchasing a master recording. Also, petitioner testified that he did not see the information memorandum until after the decision had been made to purchase the master recording of "Avocado Summer." If this is true, *416 it supports the conclusion that petitioners did not have an actual and honest profit objective, particularly in view of their lack of experience in the distribution of master recordings. Petitioner may not have understood the tax concepts discussed in the memorandum, but we cannot believe that he ignored the "bottom line" calculations. Petitioner testified that he negotiated the terms of the purchase agreement. He gives no details, however, as to these negotiations. Also, the purchase agreement appears to be a standard form agreement prepared by or for Jackie Resources, Inc., to which names, dates, signatures, and other relevant data are added in the blanks. Petitioners' conduct after their purchase of the master recording also fails to indicate a profit objective. Petitioners did not maintain separate bank accounts or separate business records for their master recording activity. See Beck v. Commissioner,85 T.C. at 576-577. Petitioners' distributor, IRDA, did not distribute any records and did not provide petitioners the periodic statements as required by the employment contract. Nevertheless, petitioners did not change distributors although they could have *417 done so with 10 days' prior written notice. Petitioners testified that they made several phone calls to IRDA in monitoring the distribution of the albums; that they also phoned several radio stations to see if the radio stations had received copies of the album; and that they played the album in their lounge and gave out promotional copies to patrons of their lounge. Petitioners, however, never made arrangements to manufacture more than 1,000 records, although the projections on which the seller's appraisals were based assumed sales of 250,000 or 300,000 albums, and petitioners' own profit calculations assumed sales of 100,000 albums. Petitioners' use of a large nonrecourse not indicates the lack of an actual and honest objective of making a profit because the note was contingent, illusory, and without any real economic substance. Even the information memorandum specifically stated that a record rarely generated enough receipts to pay the full purchase price. On numerous occasions, we have stated that "the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to *418 generate tax deductions rather than to earn an economic profit." Seaman v. Commissioner,84 T.C. 564, 596 (1985). See Estate of Baron v. Commissioner,83 T.C. at 556. The lack of order and chronology of transaction dates as reported on various documents and as testified to by petitioners also shows an absence of businesslike conduct. Of particular importance is a letter from Jackie Resources dated November 20, 1978. That letter stated (1) that petitioners should sign the enclosed "employment contract and return it with the required payment of $2,250; (2) that when IRDA received the master recording and other necessary materials from Jackie Resources, the album would soon go into production; and (3) that its enclosed press kit would provide more information in IRDA. This letter suggests that the employment contract with IRDA had not, at that time, been executed by both parties and that IRDA had not, at that time, received a master recording from Jackie Resources. Petitioner testified, however, that he received his own copies of the album (which must be made from the master recording) from IRDA in the spring of 1978, more than 6 months before *419 the date of this letter. The employment contract is dated November 20, 1977, a year before the date of the latter and before petitioner was asked to sign the employment contract enclosed in the letter. Petitioners claimed depreciation deductions and an investment tax credit in 1977 regarding the master recording activity although, according to this letter, the album was not even in production as of November 20, 1978. Furthermore, petitioner, in the employment contract, confirmed his title to and ownership of the master recording; however, petitioner did not even purchase the master recording until one month after the date of the employment contract. Based on these inconsistencies, we find it difficult to accept petitioner's unconrroborated testimony and petitioners' assertions that they had an actual and honest objective of making a profit. Respondent analogizes the facts in this case to those in Estate of Baron v. Commissioner,supra, wherein we denied a taxpayer's claimed deductions regarding a master recording activity. In Baron, the taxpayer purchased a master recording for $650,000, comprised of $90,000 cash and nonrecourse notes for $560,000 *420 payable solely out of the record sales proceeds. The master recording was a sound track to the movie "The Deep"; it had a famous artist, Donna Summer, and a well-known distributor, Casablanca. Nevertheless, because of Baron's lack of experience in the area, Baron's lack of investigative efforts, the extensive amount of the nonrecourse notes, and Baron's failure to check production and distribution progress, we held that no profit objective existed. Petitioners argue that Estate of Baron is distinguishable from this case because (1) petitioners, unlike the taxpayers in Estate of Baron, were not actively seeking investments; (2) the purchase price and the nonrecourse financing were much larger in Estate of Baron; (3) the taxpayers in Estate of Baron were in a higher tax bracket than petitioners; (4) no appraisals were available before the purchase of the master recording in Estate of Baron; and (5) petitioners took a more active role in the master recording activity than the taxpayers in Estate of Baron. Mindful of those assertions, we nevertheless conclude that the determinativefactors are the same in both cases, i.e., (1) lack of prior experience *421 in the area, (2) very little prepurchase investigation of the activity, (3) a large nonrecourse note payable solely out of sales proceeds, and (4) very little monitoring of production and distribution of the record. [4] The applicable rules do not vary based on the particular tax bracket or the dollar amounts involved. Also, petitioners' conduct, while arguably more active than the conduct of the taxpayers in Estate of Baron, was only minimal. Having made a few telephone calls, having played the album and given away promotional copies, and having read an "appraisal" before the purchase of the master recording do not carry petitioners' burden of proving a profit objective. Cf. Independent Electric Supply, Inc. v. Commissioner,781 F.2d 724 (1986), affg. a Memorandum Opinion of this Court. Petitioners have, on brief, apparently conceded the issue with respect to the nonrecourse note; however, that concession does not affect our analysis of petitioners' intent at the time they entered into and conducted the master recording *422 activity. As in Estate of Baron, the most reasonable conclusion is that the anticipated tax benefits resulting from the inclusion of the nonrecourse note in the purchase price were the primary incentive for petitioners' involvement in the master recording activity. Where an asset is purchased using nonrecourse indebtedness, whether the fair market value of the asset approximated its purchase price may be considered in determining whether the taxpayer possessed the necessary profit objective. Beck v. Commissioner,85 T.C. at 577, and cases cited therein. Respondent offered the only expert witness at trial and also produced a report prepared by the expert witness summarizing his examination of the album and the relevant documents associated with petitioners' master recording activity. Petitioners' cross-examination failed to impeach respondent's witness, and his testimony and report were not contradicted by other evidence. (Although petitioners argue that they relied on the appraisals provided by the seller, those appraisals are hearsay and can only be considered *423 in relation to petitioner's intent and not as evidence of value.) In his report, respondent's witness stated that in his opinion the master recording of "Avocado Summer" was worth approximately $10,000. This value of the master recording was substantially less than the purchase price of $110,000 on which petitioners based their deductions and credits during the years in issue. In conclusion, we hold that petitioners failed to satisfy their burden of proving that they engaged in the master recording activity with an actual and honest objective of making a profit. As a result, we need not address respondent's alternative arguments that the purchase of the master recording was a sham transaction, that the property was not eligible for the investment tax credit, and that petitioners' basis in the master recording cannot include any excess of the purchase price over the fair market value of the master recording. Additional Interest
By Amendment to the Answer, respondent asserted the applicability of section 6621(d), dealing with interest on substantial underpayments attributable to tax motivated transactions.Because respondent has raised a "new matter," he bears the burden of *424 proof on that issue. Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 6621(d) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." This section applies only with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(d). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), on appeal (2d Cir., Mar. 24, 1986). Section 6621(d)(3) includes within the definition of tax motivated transactions (1) any valuation overstatement (within the meaning of section 6659(c)) and (2) any loss disallowed by reason of section 465(a). Section 6621(d)(3)(B) permits the Secretary of the Treasury to prescribe by regulation other types of transactions that constitute tax motivated transactions. *425 Section 301.6621-2T, Q and A-4, Proced. & Admin. Regs. (Temporary), includes within the definition of tax motivated transactions any deductions disallowed for any period under section 183, relating to an activity engaged in by an individual that is not engaged in for profit. Section 301.6621-2T, Q and A-5, Proced. & Admin. Regs. (Temporary), provides the following method by which the amount of an underpayment of tax attributable to one or more tax motivated transactions is determined: (1) Calculate the amount of the tax liability for the taxable year as if all items of income, gain, loss, deduction, or credit, had been reported properly on the income tax return of the taxpayer ("total tax liability"); and (2) Without taking into account any adjustments to items of income, gain, loss, deduction, or credit that are attributable to tax motivated transactions (as defined in A-2 through A-4 of this section), calculate the amount of the tax liability for the taxable year as if all other items of income, gain, loss, deduction, or credit had been reported properly on the income tax return *426 of the taxpayer ("tax liability without regard to tax motivated transactions"). (3) The difference between the total tax liability and the tax liability without regard to tax motivated transactions is the amount of tax motivated underpayment. At the conclusion of trial, the Court directed respondent to comment in his brief as to the appropriate means of calculating the amount of the underpayment "attributable "to tax motivated transactions referred to in section 6621(d). Petitioners were told that they would have to deal with respondent's approach. Alternative calculations apply because of the separate issues in this case, i.e., the claimed subchapter S losses and the master recording items, as well as the alternative grounds for disallowance of the master recording deductions and credits. See Law v. Commissioner,84 T.C. 985, 993 (1985). Respondent carefully laid out in his brief his contentions and computations on each alternative basis for our decision. Respondent's primary position is that the deductions and investment tax credits claimed with respect to the master recording activity are not allowable because the activity was not engaged in for profit *427 and there was no income received from the activity during the years in issue. He computed the amount attributable to the master recording items as follows: 1977
Amount
Amount Properly Reportable
Properly
Without Regard to
Reportable
Tax-Motivated Transaction
Adjustments
Subchapter S Loss
$ 5,277 $ 5,277 Master Recording
2,925 Total
$ 8,202 $ 5,277 Taxable Income
As Previously Adjusted
37,429 37,429 Revised Taxable Income
$45,631 $42,706 Tax from Tax Rates
13,307 11,918 Less credits
General Tax Credit
(180)
(180)
Investment Credit
(1) (256)
(2) (11,256)
Balance
$12,871 $482 Plus: Tax from recomputing
prior year investment
credit (1)
179 179 Total Correct Tax Liability
$13,050 $661 Total Tax Shown on
Return or as Previously
Adjusted
179 179 Increase in Tax
$12,871 $482 1978
Amount
Amount Properly Reportable
Properly
Without Regard to
Reportable
Tax-Motivated Transaction
Adjustments
Subchapter S Loss
$ 6,855 $ 6,855 Master Recording
15,839 Total
$22,694 $ 6,855 Taxable Income
As Previously Adjusted
22,429 22,429 Revised Taxable Income
$45,123 $29,284 Tax from Tax Rates
13,063 Tax from Tax Tables
(3) 6,227 Less credits
General Tax Credit
(180)
Investment Credit (1)
(500)
(500)
Contribution to Candidates
(10)
(10)
Balance
$12,373 $ 5,717 Plus: Tax from recomputing
prior year investment
credit (2)
801 801 Total Correct Tax Liability
$13,174 $ 6,518 Total Tax Show on
Return or as Previously
Adjusted
4,274 4,274 Increase in Tax
$ 8,900 $ 2,244 *428 1979
Amount
Amount Properly Reportable
Properly
Without Regard to
Reportable
Tax-Motivated Transaction
Adjustments
Subchapter S Loss
$14,561 $14,561 Master Recording
15,841 Total
$30,402 $14,561 Taxable Income
As Previously Adjusted
19,921 19,921 Revised Taxable Income
$50,323 $34,482 Tax from Tax Rates
14,936 Tax from Tax Tables
(2) 7,894 Less credits
Investment Credit (1)
(337)
(337)
Balance
$14,599 $ 7,557 Plus: Tax from recomputing
prior year investment
credit (1)
342 342 Total Correct Tax Liability
$14,941 $ 7,899 Total Tax Shown on
Return or as Previously
Adjusted
4,498 4,498 Increase in Tax
$10,443 $ 3,401 The above tables set forth the amount of the properly reportable tax liability in column one and the tax liability without regard to the tax motivated transaction in column two. The difference between *429 the amount of the properly reportable tax liability and the tax liability without regard to the tax motivated transaction equals the following underpayments of tax attributable to the tax motivated transaction: $12,389 in 1977, $6,656 in 1978, and $7,042 in 1979. Because the underpayments attributable to the tax motivated transaction each exceed $1,000, a substantial underpayment attributable to a tax motivated transaction exists in taxable years 1977, 1978, and 1979 to which the 120 percent interest rate set forth in section 6621(d) applies after December 31, 1984. Notwithstanding our comments at trial and respondent's detailed analysis, petitioners ignored the section 6621(d) issues in their briefs. Because petitioners have not given us any reason to reject these computations, Decision will be entered in accordance with the above computations.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Section 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulations are as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation.↩ * * *
3. See Holland v. Commissioner,T.C. Memo. 1985-626↩, slip opinion at page 17.
4. See also Watts v. Commissioner,T.C. Memo. 1985-531; Snyder v. Commissioner,T.C. Memo. 1985-9↩.
(1). As previously agreed--Spring Valley Farms Partnership. ↩
(2). ↩
Per return in full
$11,000
Additional agreed
256
Total
11,256
(3). Tax Table Income: $29,284 + $1,500 = $30,784.↩
(1). As previously agreed--Spring Valley Farms Partnership. ↩
(2). As previously agreed. ↩
(2). Tax Table Income: $34,482 + $2,000 = $36,482.↩
(1). As previously agreed. ↩