HARRY S. AND PATRICIA A. VAN SCOYOC, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Scoyoc v. Commissioner
Docket No. 11271-86.
United States Tax Court
T.C. Memo 1988-520; 1988 Tax Ct. Memo LEXIS 552; 56 T.C.M. (CCH) 588; T.C.M. (RIA) 88520; November 8, 1988. Thomas J. O'Rourke and John J. Mullenholz, for the petitioners. Alan C. Levine, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In a timely statutory notice of deficiency, respondent determined deficiencies in Federal income tax and additions to tax as follows: Additions to Tax
Taxable
Section
Section
Section
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6661
1982
$ 17,743
$ 887.15
50 percent
$ 1,774.30
of interest
on $ 17,743
1983
12,365
618.25
50 percent
1,236.50
of interest
on $ 12,365
*555 After concessions, [2] the issues which we must resolve are: 1. Whether petitioners' yacht chartering activities constituted an "activity not engaged in for profit" within the meaning of section 183(a). 2. Whether the yacht purchased by petitioners and used in their charter activity qualifies for the investment tax credit in 1982. 3. Whether petitioners are liable for the addition to tax for negligence or intentional disregard of rules or regulations pursuant to sections 6653(a)(1) and 6653(a)(2). Whether petitioners are liable for additions to tax for substantial understatements of tax liability as provided by section 6661. [3]
*556 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are cash basis, calendar year taxpayers. They are also husband and wife and resided at McLean, Virginia, at the time their petition herein was filed. Petitioner Harry S. Van Scoyoc is an attorney who specializes in the field of taxation. During the taxable years at issue, he was employed as an associate with Charles Walker and Associates. His duties primarily involved the representation of clients before the United States Congress with respect to Federal tax matters. During the fall of 1981, petitioner [4] became interested in acquiring a sailboat for placement in a charter fleet. Petitioner had only very limited experience with sailing and sailboats in general, and no experience in the business of sailboat chartering. Petitioner was in part motivated by a desire to take advantage of the investment incentives contained in the recently enacted Economic Recovery Tax Act of 1981. Petitioner was also motivated by a belief that sailboats would continue to appreciate, or at least hold their *557 value, as they had throughout the 1970's. Petitioner placed particular reliance on a January 26, 1981 Wall Street Journal article which stated that sailboat prices had been appreciating for several years at a rate averaging 10 to 15 percent per year. Those in the boating industry attributed the appreciation in yachts to several factors. First, the energy crises of the early and mid 1970's had caused dramatic increases in the price of fuel and other petroleum based products. The increased fuel costs greatly increased the costs of operating motor powered vessels. As a result, many boating enthusiasts began to move away from powerboats into the more economical sailboats. The resulting increase in demand for sailboats drove up the prices of both new and used sailing vessels. The energy crises also contributed to the increased cost of fiberglass, a petroleum based product and the main raw material used in sailboat construction. The increased raw material costs caused increases in the prices of new sailboats, which also had the effect of increasing the value of used boats. A final factor contributing *558 to sailboat appreciation during the late 1970's was the relative weakness of the U.S. dollar vis-a-vis other currencies. This increased the cost of importing vessels constructed in foreign boatyards and in many cases made the cost of imports prohibitive. This limit on the supply of boats available, when coupled with increased demand, contributed to the appreciation in value of sailboats available on the domestic market. After talking with several boat brokers, and comparing the proposals offered by several charter operators, petitioner decided to purchase a new 36-foot Cape Dory sailing sloop from Nautilus Yacht Sales (hereinafter referred to, collectively with its affiliates, as "Nautilus"). [5] The purchase of the boat was for a price of $ 101,780 and was consummated on December 24, 1981. Petitioners christened their boat "La Cygnette." Petitioners also purchased a slip at the West River Yacht Harbor as part of the same transaction. The purchase price of the slip was $ 22,500. This transaction was consummated on February 16, 1982. *559 Immediately upon purchase, La Cygnette was leased back to Nautilus for the three-year period ending December 24, 1984. [6] The total rental payment of $ 20,356 was due under the lease agreement was payable on January 15, 1982. Under the terms of the lease, Nautilus was responsible for all routine maintenance of the boat during the lease term. Owners who placed their vessels into the lease program were entitled to use of the West River Yacht Harbor marina facilities. They also became entitled to use of their boat (or a similar boat if theirs was chartered) for a minimum of twenty-one days per year. Additional personal usage was possible only if their boat was available. [7]
*560 Petitioner also leased the slip back to Nautilus for the period beginning February 16, 1982 (the closing date) and ending December 30, 1984. The entire $ 4,500 lease payment due under this agreement was due on February 16, 1982. The Nautilus leaseback program enabled purchaser/lessors to own a yacht and a slip in which to moor it with little or no initial cash outlay. [8] Petitioners in this case made an initial cash deposit of $ 1,000 on La Cygnette and the slip. [9] Petitioners financed their downpayment on the boat by executing a $ 20,356 note payable to Nautilus. The note was due January 15, 1982, and was presumably to be paid with the lease payment of the same amount which was due petitioners on that date. The remaining $ 81,424 of the yacht's purchase price was financed with the proceeds of an $ 81,424 recourse loan obtained from the Capital City Federal Savings and Loan Association. The loan bore interest at 17 percent and was self-amortizing over a fifteen-year period. The loan called for a $ 1,253.122 monthly payment of principal and interest. *561 Similarly, the $ 4,500 downpayment on the slip was satisfied with the rental payment of the same amount which was due at closing. The remaining $ 18,000 of the slip's $ 22,500 purchase price was financed with an $ 18,000 recourse loan from the Bank of Maryland. This loan bore interest at the rate of 18 percent per annum and was self-amortizing over a ten-year period. The monthly payment of principal and interest required on this loan was $ 324.33. The Nautilus leaseback program was advertised as a good investment, as well as an economical way to own and enjoy a yacht. Nautilus promotional material also emphasized the tax benefits allegedly available through participation in the program. During 1982, petitioners reported no gross income from their yacht chartering activity other than the $ 20,356 advance lease payment on La Cygnette, and the $ 4,500 in advance rent on the slip at West River Yacht Harbor. During 1983, petitioners reported only $ 1,200 of gross receipts from yacht chartering. On their Schedule Cs attached to their 1982 and 1983 returns, petitioners showed net income of $ 2,517 and a net loss of $ 28,092, respectively, from their yacht chartering activities. *562 [10] Petitioners also reported payments of interest of $ 17,388 and $ 14,200 on the loans secured to purchase the boat and slip as itemized deductions on Schedule A of their 1982 and 1983 tax returns, respectively. At trial, petitioners conceded that these interest deductions were attributable to the yacht chartering activity and should have been reported on Schedule C. Had these interest payments been treated properly, petitioner would have shown losses of $ 14,871 and $ 42,292 in 1982 and 1983, respectively, from their chartering activities. Petitioners showed total income from sources other than their charter activities of $ 143,389 and $ 119,549 on their returns for 1982 and 1983, respectively. Petitioner was initially satisfied with Nautilus' performance of its obligations under the lease agreements However, the quality of the maintenance provided by Nautilus soon began to deteriorate, in part due to financial difficulties which would eventually result in its bankruptcy. Petitioners *563 had been unaware of any problems with Nautilus' finances when they first entered their relationship with it. Petitioner became so concerned with Nautilus' failure to perform its maintenance obligations, and with rumors circulating that Nautilus' bankruptcy was imminent, that he retook possession of his vessel and terminated his association with Nautilus two months prior to the scheduled termination of the boat lease agreement. Petitioner then contracted with Strandquist Yacht Charters to act as his agent in chartering La Cygnette. This relationship proved to be no more satisfactory than had the Nautilus arrangement, and was terminated by petitioner at the end of the 1985 sailing season. During the 1986 and 1987 sailing seasons, petitioner chartered the boat on his own without the assistance of a charter agent. During all of the years of his charter activity, petitioners have maintained a separate checking account for exclusive use in their charter activity. They have also maintained books and records of their charter activities. Respondent mailed a statutory notice of deficiency to petitioners on April 16, 1986. In the notice, respondent determined, inter alia, that *564 petitioners' yacht chartering activity was an activity not engaged in for profit. He therefore increased petitioners' taxable income by $ 14,871 and $ 29,292 for taxable years 1982 and 1983, respectively. Additionally, respondent determined that petitioners were not entitled to the $ 10,178 of investment tax credit claimed with respect to their yacht in 1982. Finally, respondent concluded that petitioners' entire understatement of tax was due to negligence and was substantial, and determined additions to tax pursuant to sections 6653(a)(1) and (2), and 6661. OPINION 1. Section 183 Issue
Respondent does not contest the amount of the deductions claimed by petitioners in the years at issue or that they were in fact incurred with respect to petitioners' chartering activities. Rather, he asserts that petitioners' chartering activity was an activity not engaged in for profit. [11] An "activity not engaged in for profit" is defined in section 183(c) as an activity other than one with respect to which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212. *565 If an activity is not engaged in for profit, section 183(b)(1) allows only those deductions which are not dependent on a profit motive. Section 183(b)(2) allows all other deductions which would be allowable if the activity was engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). Deductions are allowable under section 162 for expenses of carrying on an activity which constitutes the taxpayer's trade or business if those expenses are ordinary and necessary to the conduct of the trade or business. Section 212 allows the taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. In order to deduct expenses of an activity, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), *566 affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, "profit" means economic profit, independent of tax savings. Landry v. Commissioner,86 T.C. 1284, 1303 (1986), on appeal (5th Cir., Jan. 12, 1987); Herrick v. Commissioner,85 T.C. 237, 255 (1985); Beck v. Commissioner, supra at 570; Estate of Baron v. Commissioner,83 T.C. 542, 557-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Surloff v. Commissioner,81 T.C. 210, 233 (1983). While the expectation of economic profit need not be reasonable, the fact and circumstances must indicate that the taxpayer entered into the activity, or continued it, with the objective of making a profit. Beck v. Commissioner, supra;Fox v. Commissioner,80 T.C. 972, 1006 (1983); Dreicer v. Commissioner, supra.
The burden of proof is on petitioners to show that they engaged in their boat chartering activity with the objective of realizing *567 an economic profit. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). In making this determination, all relevant facts and circumstances are to be taken into account.[12]Finoli v. Commissioner,86 T.C. 697, 722 (1986); Golanty v. Commissioner, supra;Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). Greater weight must be given to objective facts than to petitioners' mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). After carefully reviewing the entire record before us, we conclude that petitioners have failed to carry their burden of proving that they engaged in the activity with an actual and honest profit objective. *568 The "facts" which petitioners rely on in support of their position are based almost entirely on Mr. Van Scoyoc's own self-serving testimony. Mr. Van Scoyoc claimed that he fully expected to realize net negative cash flows during the early years of the charter activity, but that he looked at the boat and slip as a 15 to 20-year investment. Over that period he expected his cash flow to gradually increase through pay down of his loan balances and increased charter fees. Petitioner thus claims that he believed he would eventually reach a positive cash flow position. The only evidence presented that petitioners looked at the investment with a 15 to 20-year time frame is Mr. Van Scoyoc's own self-serving testimony. We find the cash flow projections provided by Nautilus, on which petitioner acknowledges he relied, more persuasive. These projections go out only to the year 1985. They do not show a positive before tax cash flow in any year for either the boat or the slip. [13] Mr. Van Scoyoc testified that he felt it was unrealistic to expect to earn consistently as much as $ 12,000 from charter operations. Even had petitioners managed to achieve this level of revenue, they still would *569 not have been able to cover even the loan payments on the boat. [14]
Petitioners also contend that they hoped the proceeds from the eventual disposition of the boat and slip would offset the losses incurred in their charter activity. [15] Mr. Van Scoyoc testified that he expected the boat *570 to depreciate in value during the first three years of ownership. He anticipated that it would then begin appreciating in value until by the fifth year it was again worth its original purchase price. Mr. Van Scoyoc's testimony in this regard is corroborated by the analysis provided to him by Nautilus. The Nautilus analysis also shows the slip would appreciate in value to $ 29,948 after three years of ownership and to $ 36,236 after five years. Again, we discount Mr. Van Scoyoc's testimony that he viewed his investment's profit potential over a 15 to 20-year period. The only documentary evidence presented, the Nautilus analysis, points to a 3 to 5-year investment horizon. At the end of 5 years, the analysis indicates that petitioners would realize $ 44,830 from the sale of the boat ($ 101,780 sales price less $ 56,941 remaining balance on the boat loan). This would not cover the $ 75,485 of negative cash flow before *571 taxes which the analysis indicates would be incurred during the years of boat ownership. [16]
The sale of the slip at the end of five years for $ 36,236 would generate $ 23,464 of cash flow after payment of the remaining balance of $ 12,772 on the slip loan. This would only offset the negative cash flow before taxes of $ 16,245 incurred during the years the slip was owned by $ 7,219. [17] Thus, the Nautilus analysis, the only documentary evidence presented by petitioners as *572 supportive of their general conclusions regarding the profit potential of their chartering activities, showed an overall negative cash flow of $ 23,427 before taxes from their investment in the boat and slip over the 5-year period. This is contrasted with the net tax savings of $ 30,298 which the Nautilus analysis indicates would be realized through participation in its sale/leaseback program. Giving greater weight to objective facts than to petitioner's mere statements of intent, we conclude that petitioners did not engage in the yacht chartering activity in the years at issue with the objective of deriving an economic profit therefrom. Rather, it seems more likely that petitioner's motivation was to garner the significant tax benefits they hoped to enjoy through participation in the program, and thereby shelter a portion of their substantial income from other sources. Although petitioners certainly would have liked to show a profit before taxes, their failure to draw up any kind of realistic analysis to determine the feasibility of such an outcome indicates to us that this objective was of only secondary importance to them. Petitioners may therefore deduct the expenses incurred *573 in their charter activity only as provided by section 183. [18]
*574 2. Investment Tax Credit Issue
Section 38 provides that a credit against income tax is allowed to a taxpayer for qualified investment in certain property. The credit is allowable for property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and which has a useful life of 3 years or more. [19] Sec. 48(a)(1). Depreciation is allowable on property used in a trade or business or held for the production of income. Sec. 167(a). Our determination that petitioner's yacht chartering activity was not engaged in with the objective of making a profit is thus dispositive of this issue. See Finoli v. Commissioner,86 T.C. at 744; Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. in an unpublished opinion 732 F.2d 164 (9th Cir. 1984). *575 3. Negligence
Respondent determined that the entire underpayment of tax by petitioners are attributable to negligence and imposed the additions to tax provided for by section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax equal to five percent of the underpayment when any portion of the underpayment is due to negligence or intentional disregard of rules and regulations (but without intent to defraud). Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment which is attributable to negligence. Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would under the circumstances. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Petitioner bears the burden of proving that his underpayment of tax was not attributable to negligence. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rule 142(a). We find imposition of the addition to tax for negligence upon petitioners with respect to their charter activities to be inappropriate. It seems likely that both profit potential and tax shelter benefits *576 were factors in petitioners' decision to enter the yacht chartering activity. Petitioners were unable to prove that profit potential was the objective for their entrance into yacht chartering. However, the fact that petitioners' proof was inadequate on this issue does not require us to find that the underpayment with respect to the charter activity was due to negligence. Under the circumstances of the instant record, we find that petitioners' claim of losses with respect to their charter activity was not due to negligence. Respondent stipulated that the addition to tax for negligence was only appropriate if the section 183 issue was resolved in his favor. We take this as a concession by respondent of the negligence addition as it relates to the adjustments for $ 565 of dividend income and $ 11 of interest in 1982 which have been conceded. 4. Substantial Understatement
Respondent determined that the understatement of tax by petitioners were substantial and imposed an addition to tax equal to 10 percent of the underpayment attributable to such understatements pursuant to section 6661. [20] That section defines a "substantial understatement" as one which exceeds the greater *577 of 10 percent of the tax required to be shown on the return of $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is reduced for section 6661 purposes by the portion of the understatement which is attributable to petitioners' treatment of an item if there is substantial authority for such treatment, or if relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In evaluating whether the taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. [21]Sec. 1.661-3(b)(1), Income Tax Regs. The substantial authority standard is less stringent than a "more likely than not standard," but stricter than a reasonable basis standard. Sec. 1.6661-3(a)(2). *578 The weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs.
Petitioners have not argued that adequate disclosure for purposes of section 6661 was made on their return. Consequently, we do not address that issue. Nor do petitioners argue that there was substantial authority for the 1982 omissions from taxable income which they have conceded. Petitioners do, however, argue that their position with regard to deductions taken with respect to their yacht chartering activities were supported by substantial authority. Specifically, petitioners point to several cases involving yacht chartering activities in which taxpayers succeeded in proving that their objective was the making of profit. Cases cited by petitioners include Slawek v. Commissioner,T.C. Memo. 1987-438; Zwicky v. Commissioner,T.C. Memo. 1984-471; Dickson v. Commissioner,T.C. Memo. 1983-723; *579 McLarney v. Commissioner,T.C. Memo. 1982-461. In Antonides v. Commissioner, 91 T.C.   (September 27, 1988), the taxpayers relied on these same cases as establishing substantial authority for their position with respect to deductions claimed as a result of their involvement in the Nautilus sale/leaseback program. We concluded that the cited cases were materially distinguishable on their facts from the facts in Antonides and thus did not constitute substantial authority for the taxpayers' position. We can discern no material distinction between the facts herein and those in Antonides, which would impact on our determination as regards section 6661. We therefore conclude that the cited cases do not constitute substantial authority for petitioners' position with respect to their yacht chartering activities for the same reasons expressed in Antonides.
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioners have conceded adjustments in the statutory notice of deficiency which increase their taxable income in 1982 by $ 565 of dividend income and $ 11 of interest income.↩
3. In his trial memorandum and opening statement, respondent for the first time argued that petitioner's use of $ 20,356 of advance lease payments as downpayment on their yacht purchase was a sham which should be given no effect for tax purposes. We do not believe that petitioners received fair notice of this issue and will not consider it. Seligman v. Commissioner,84 T.C. 191, 197-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Estate of Horvath v. Commissioner,59 T.C. 551, 554-557↩ (1973).
4. References to petitioner in the singular are references to Harry A. Van Scoyoc.↩
5. There were three entities involved in the Nautilus operation. Nautilus Yacht Sales was a sales entity which offered a sale/leaseback program under which a purchaser was offered an opportunity to purchase a boat from Nautilus Yacht Sales and lease it back to Nautilus Boat Club. Nautilus Boat Club offered memberships to persons who were interested in sailing but did not wish to buy a boat. For an annual membership fee, club members were entitled to use of a sailboat from the Nautilus Boat Club fleet for a prescribed number of days. West River Yacht Harbor was a condominium association which owned slips and other facilities at the site of the Nautilus Boat Club.↩
6. Although the lease agreement states that the lease commenced on December 24, 1981, petitioner did not take delivery of his boat until April 1982. The parties have thus stipulated that the yacht was not placed in service until 1982. ↩
7. The only "personal" uses of the boat petitioner acknowledges are the several occasions on which he donated the use of the yacht to one of several charities with which he was involved for fund raising purposes. Petitioner claims to have attempted to maximize revenues by using his personal days to entertain clients on behalf of his employer. Petitioner was reimbursed $ 990 in 1984 and $ 3,135 in 1985 by his employer for use of the boat. Petitioners' returns for the years at issue however, do not indicate any amounts as having been received from his employer as charter fees. As reflected on their tax returns, petitioners generated the following total revenues from slip rentals and charter activities: ↩
1982
$ 24,856
1983
1,200
1984
2,190
1985
4,935
1986
8,920
$ 42,101
8. Nautilus promotional material for its sale/leaseback program indicates that purchase of both a slip and a boat were necessary to participate in the program. ↩
9. The $ 1,000 deposit, along with an additional check for $ 645.18, was applied toward the closing costs associated with purchase of the boat slip.↩
10. ↩
1982 1983 Gross Income
$ 24,856 $  1,200 Depreciation
(17,742)
(24,642)
Other Expenses
(4,597)
(4,650)
Net Income
$  2,517 ($ 28,092)
11. Neither respondent nor petitioners have argued that petitioners' activities with regard to the boat and the slip should be regarded as separate activities for purposes of sec. 183. See sec. 1.183-1(d)(3), Income Tax Regs.↩ The fact that both assets were purchased as part of the same transaction from the same seller supports our conclusion that only one activity was involved. The fact that petitioners kept only one set of books and records and reported the results of operation of both assets on a single Schedule C indicates that petitioners also considered themselves engaged in a single activity. Reference to petitioners' activities as regards both the boat and the slip are referred to as their "charter activity."
12. Sec. 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Benz v. Commissioner,63 T.C. 375, 382↩ (1974).
13. The projection for the boat does show a small net positive cash flow of $ 374.44 in 1982. However this is only achieved by including the $ 20,356 advance lease payment as "cash in" without a corresponding "cash out" for satisfaction of the note given as downpayment on the boat. Had this payment been properly reflected, the projection would have shown a negative cash flow of $ 19,981.56 in 1982. ↩
14. Mr. Van Scoyoc testified that he eventually paid off his loans and argues that this indicates an effort to contain costs and therefore make a profit on the charter activities. However, there is no evidence that Mr. Van Scoyoc anticipated paying off these loans when he first entered the charter activity. As only the taxable years 1982 and 1983 are at issue, we express no opinion as to whether petitioner possessed the requisite profit objective once the loan obligations had been extinguished.↩
15. We consider the use of the boat and slip for charter activities and the holding of these assets for appreciation to be a single "activity" within the meaning of sec. 183. See fn. 11. See also Dickson v. Commissioner,T.C. Memo. 1983-723↩.
16. The actual negative cash flow for 1981 thru 1985 as shown on the Nautilus projections on the boat was $ 55,129. However, as stated in footnote 12, the projection failed to show the $ 20,356 downpayment as cash outflow. Even a cursory inspection of the Nautilus projections by petitioner would have revealed this discrepancy. Also the Nautilus summary of the investment program indicates that it is a summary of results after five years of ownership. However, although it uses the results of operations for four years. Petitioners' failure to give effect to these obvious errors in the Nautilus projections is further evidence that economic profit was not their objective in pursuing the charter operations.↩
17. The Nautilus projections show a negative cash flow of $ 11,745 related to slip ownership through 1985. However, the analysis fails to take into consideration the $ 4,500 downpayment on the slip as a cash outflow. See footnotes 12 and 15. ↩
18. Although without effect to our resolution of the issues herein, we note several errors made by respondent in his application of sec. 183 in his notice of deficiency. First, the notice incorrectly states that deductions allowable under sec. 183(b)(1) are allowable only to the extent of gross income derived from the activity. Sec. 183(b)(1) deductions are allowable regardless of whether an activity generates any gross income. Thus the interest expenses incurred in their charter activity of $ 17,388 and $ 14,200 in 1982 and 1983, respectively, are deductible by petitioners in full. Furthermore, since this interest is incurred in an activity not engaged in for profit, it is properly deducted as an itemized deduction on Schedule A. All expenses other than those allowable under sec. 183(b)(1) are allowable under sec. 183(b)(2) only to the extent gross income from the activity exceeds the deductions allowable under sec. 183(b)(1). Thus, petitioners are entitled to no further deductions in 1983 with respect to their charter activity. The regulations state that all sec. 183(b)(2) deductions other than those which give rise to a basis adjustment are deducted first. Sec. 1.183-1(b)(1)(ii), Income Tax Regs. Thus, petitioners are entitled to an additional deduction of $ 4,597 in 1982 under sec. 183(b)(2). Finally, petitioners are allowed an additional deduction for those deductions which involve basis adjustment (i.e., depreciation) to the extent gross income from the activity exceeds the sec. 183(b)(1) deductions and those previously allowed under sec. 183(b)(2). Sec. 1.183-1(b)(1)(iii), Income Tax Regs.↩ Thus, petitioners are entitled to a depreciation deduction of $ 2,871 in 1982 with a corresponding adjustment to their basis in the boat and slip.
19. We have determined that petitioners are entitled to a depreciation deduction on their boat in 1982 pursuant to sec. 183(b)(2). This would appear to bring the boat within the literal definition of "Section 38 property" as contained in Sec. 48(a)(1). However, sec. 1.48-1(b), Income Tax Regs., expands upon the Code definition as follows: Property (with the exception of property described in section 48(a)(1)(F) and paragraph (p) of this section) is not section 38 property unless a deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under section 167 * * * [Emphasis added.] Therefore, the determination as to whether property meets the definition of section 38 property (i.e., is depreciable) and is thus eligible for the investment tax credit must be made by reference to sec. 167 only, without regard to the provisions of sec. 183. See Finoli v. Commissioner,86 T.C. 697, 744-745↩ (1986).
20. The Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the sec. 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. See Pallottini v. Commissioner,90 T.C. 498 (1988). Respondent has not amended his answer to seek an increase to the sec. 6661(a) addition to tax over the amount determined in the notice of deficiency. Accordingly, we merely sustain respondent's determination of sec. 6661(a) additions to tax equal to 10 percent of the underpayment attributable to the substantial understatements. We also note that in the Rule 155 computation the "understatement" must be reduced by any withholding credits in determining the "underpayment" to which the sec. 6661 addition to tax applies. See Woods v. Commissioner,91 T.C. 88↩ (1988). 21. In determining whether there is substantial authority, only the following will be considered authority: applicable provisions of the Internal Revenue Code and other statutory provisions; temporary and final regulations construing such statutes; court cases; administrative pronouncements (including revenue rulings and revenue procedures); tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; and Congressional intent as reflected in Conference Committee reports, and floor statements made prior to enactment by one of the bill's managers. Sec. 1.6661-3(b)(2), Income Tax Regs.↩